## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

GARY TSIRELMAN, M.D.,

*Plaintiff,*

-v.-

RICHARD F. DAINES, M.D., Commissioner
of Health, New York State Department of
Health; and New York State Department Of
Health; and KENDRICK A SEARS, M.D.,
Chairman of the State Board For Professional
Medical Conduct, New York State Department
of Health, and State Board For Professional
Medical Conduct and their employees and
agents,

*Defendants.*

Civil Action
No. 10 Civ. 0903 (JBW)(RLM)

August 2, 2010

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. i

PRELIMINARY STATEMENT ........................................................................................1

COUNTERSTATEMENT OF THE CASE..........................................................................5

LEGAL STANDARD ........................................................................................................22

ARGUMENT.....................................................................................................................23

I.   New York's Use of the Minimum Standard of Proof for Fraud-
     Based Medical License Revocations Fails To Comply With
     Federal Due Process Requirements ............................................................23

     A.   Plaintiff's Facial Challenge Is Limited to Medical License
          Revocation Charges Based on Fraud................................................23

     B.   Courts Agree That Fraud-Based Medical License Revocation
          Charges Require Proof By Clear and Convincing Evidence............24

     C.   Fraud-Based Medical License Revocations Require
          Heightened Procedural Safeguards in Light of the Significant
          and Irreparable Harm Resulting from Erroneous Revocations ........34

     D.   The Absence of Any Evidentiary Rules Further Exacerbates
          the Other Procedural Defects of New York Medical License
          Revocation Procedures ....................................................................44

II.  Defendants' Revocation of Plaintiff's Medical License Violated
     Plaintiff's Federal Due Process Rights ......................................................47

     A.   The Hearing Committee's Lax Standard of Proof and
          Evidentiary Rules Deprived Plaintiff of a Fair Hearing To
          Rebut Defendants' Charges of Fraud ..............................................48

     B.   Plaintiff's As-Applied Due Process Challenges Are Not
          Barred by Collateral Estoppel or Res Judicata .................................53

III. Federal Due Process Requires a Non-Discretionary Mechanism
     For Ensuring that Medical License Revocations Comply With
     Procedures In Effect While the Revocation Is Under Direct Review........55

A.  Medical License Revocation Proceedings Must Provide a
    Mechanism for Ensuring Compliance With Procedural Rules
    In Effect While Under Direct Review .............................................56

B.  Younger Abstention Is Inapplicable ...................................................60

CONCLUSION.................................................................................................................62

## TABLE OF AUTHORITIES

## <u>CASES</u>

*Addington v. Texas*,
   441 U.S. 418 (1979) ............................................................................................ passim

*Bazin v. Novello*,
   754 N.Y.S.2d 446 (3d Dep't 2003) ............................................................................33

*Bernard v. Bd. of Dental Exam'rs*,
   465 P.2d 917 (Or. Ct. App. 1970) ..............................................................................31

*Brady v. Maryland*,
   373 U.S. 83 (1963) ......................................................................................................58

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) ......................................................................................................44

*Colon v. Coughlin*,
   58 F.3d 865 (2d Cir. 1995) .........................................................................................54

*Daniels v. Millar Elevator Indus., Inc.*,
   845 N.Y.S. 2d 785 (2d Dep't 2007) ...........................................................................57

*Davidson v. Capuano*,
   792 F.2d 275 (2d Cir. 1986) .......................................................................................54

*Davis v. Halpern*,
   813 F.2d 37 (2d Cir. 1987) .........................................................................................54

*Davis v. Wright*,
   503 N.W.2d 814 (Neb. 1993) ......................................................................................28

*Dorsett-Felicelli, Inc. v. County of Clinton*,
   305 F. App'x 685 (2d Cir. 2008) (summary order) .....................................................60

*Ettinger v. Bd. of Med. Quality Assurance*,
   185 Cal. Rptr. 601 (Cal. Ct. App. 1982) .....................................................................28

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
   544 U.S. 280 (2005) ...................................................................................................61

*Fein v. Starrett Television Corp.*,
   116 N.Y.S. 2d 571 (1st Dep't 1952) ...........................................................................29

*Ferris v. Turlington*,
  510 So. 2d 292 (Fla. 1987)...........................................................................................28

*Foster v. Bd. of Dentistry*,
  714 P.2d 580 (N.M. 1986) ...........................................................................................31

*Gallant v. Bd. of Medical Examiners*,
  974 P.2d 814 (Or. Ct. App. 1999)................................................................................31

*Ghandi v. Wisc. Med. Examining Bd.*,
  483 N.W.2d 295 (Wisc. App. Ct. 1992)........................................................................33

*Giffone v. De Buono*,
  693 N.Y.S.2d 691 (3d Dep't 1999)...............................................................................32

*Goldberg v. Kelly*,
  397 U.S. 254 (1970).....................................................................................................41

*Gould v. Board of Regents of University*,
  478 N.Y.S. 2d 129 (3d Dep't 1984)..............................................................................32

*Gross v. De Buono*,
  636 N.Y.S. 2d 147 (3d Dep't 1996)..............................................................................57

*Gualandi v. Adams*,
  385 F.3d 236 (2d Cir. 2004).........................................................................................22

*Gudema v. Nassau County*,
  163 F.3d 717 (2d Cir. 1998).........................................................................................59

*Hachamovitch v. DeBuono*,
  159 F.3d 687 (2d Cir. 1998)....................................................................................24, 54

*Hayden v. Paterson*,
  594 F.3d 150 (2d Cir. 2010).........................................................................................22

*Huffman v. Pursue, Ltd.*,
  420 U.S. 592 (1975).....................................................................................................61

*In re Cobley*,
  89 B.R. 446 (Bankr. E.D. Pa. 1988).............................................................................29

*In re Grimm*,
  635 A.2d 456 (N.H. 1993) ...........................................................................................33

*In re Seymour Friedman*, No. MC-93-0180,
  1996 WL 705322 (E.D.N.Y. Nov. 26, 1996)...........................................................33, 36

*In re Theodore Friedman*,
  51 F.3d 20 (2d Cir. 1995)..............................................................................................33

*In re Zar*,
  434 N.W.2d 598 (S.D. 1989) .........................................................................................28

*Jenkins v. Artuz*,
  294 F.3d 284 (2d Cir. 2002)...........................................................................................45

*John Doe No. 1 v. Reed*,
  130 S. Ct. 2811 (2010) ...................................................................................................23

*Johnson v. Bd. of Governors of Registered Dentists*,
  913 P.2d 1339 (Okla. 1996) ...........................................................................................27

*Kirschner v. Klemons*,
  225 F.3d 227 (2d Cir. 2000)...........................................................................................60

*Kreisler Borg Florman Gen. Constr. Co. v. Tower 56, LLC*,
  872 N.Y.S. 2d 469 (2d Dep't 2009) ...............................................................................39

*Lassiter v. Dep't of Social Services*,
  452 U.S. 18 (1981) .........................................................................................................35

*Liberty Mut. Ins. Co. v. Hurlbut*,
  585 F.3d 639 (2d Cir. 2009)...........................................................................................60

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)............................................................................................... passim

*Matter of Polk*,
  449 A.2d 7 (N.J. 1992)...................................................................................................33

*Matter of Tsirelman*,
  876 N.Y.S.2d 237 (3d Dep't 2009) ...........................................................................50, 52

*Meachem v. Wing*,
  77 F. Supp. 2d 431 (S.D.N.Y. 1999)..............................................................................61

*Miss. State Bd. of Nursing v. Wilson*,
  624 So.2d 485 (Miss. 1993) ...........................................................................................28

*Morehouse v. Volkswagen Aktiengesellschaft*,
  427 N.Y.S. 2d 514 (3d Dep't 1980)..............................................................................57

*Morfesis v. Sobol*,
  567 N.Y.S. 2d 954 (3d Dep't 1991)..............................................................................45

*N.D. State Bd. of Med. Examiners v. Hsu*,
  726 N.W.2d 216 (N.D. 2007)........................................................................................33

*Nat'l Westminster Bank USA v. Weksel*,
  511 N.Y.S. 2d 626 (1st Dep't 1987) ............................................................................39

*Nguyen v. Dept. of Health Med. Quality Assurance Comm'n*,
  29 P.3d 689 (Wash. 2001)...................................................................................... passim

*Painter v. Abels*,
  998 P.2d 931 (Wyo. 2000) ......................................................................................26, 40

*Rivera v. Minnich*,
  483 U.S. 574 (1987)......................................................................................................32

*Rivers v. McLeod*,
  252 F.3d 99 (2d Cir. 2001)............................................................................................60

*Rodriguez v. Diaz*, No. 05-Civ-1831,
  2009 WL 790035 (S.D.N.Y. March 25, 2009)..............................................................59

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)....................................................................................30, 49

*Ross v. State Bd. for Professional Medical Conduct*,
  845 N.Y.S. 2d 162 (3d Dept. 2007) ..............................................................................39

*RRI Realty Corp. v. Incorporated Village of Southampton*,
  870 F.2d 911 (2d Cir. 1989)..............................................................................35, 36, 48

*Santosky v. Kramer*,
  455 U.S. 745 (1982)............................................................................................... passim

*Selling v. Radford*,
  243 U.S. 46 (1917).........................................................................................................34

*Silva v. Superior Court*,
  17 Cal. Rptr. 2d 577 (Cal. Ct. App. 1993) ...................................................................28

*Sokol v. N.Y. State Dep't of Health*,
  636 N.Y.S.2d 450 (3d Dep't 1996) .............................................................................. 41

*Ty Inc. v. Softbelly's, Inc.*,
  517 F.3d 494 (7th Cir. 2008) ................................................................................. 30, 40

*United States v. Salerno*,
  481 U.S. 739 (1987) .................................................................................................. 44

*University Club v. City of New York*,
  842 F.2d 37 (2d Cir. 1988) ...................................................................................... 24

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ............................................................................. 30, 49

*Vitek v. Jones*,
  445 U.S. 480 (1980) .................................................................................................. 27

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
  815 F.2d 522 (9th Cir 1984) .................................................................................... 30

*Wilkerson v. Johnson*,
  699 F.2d 325 (6th Cir. 1983) ............................................................................... 35, 48

*Woodby v. INS*,
  385 U.S. 276 (1966) .................................................................................................. 34

## STATUTES

New York Education Law § 6530(2) ................................................................................. 12

New York Public Health Law § 230(1) ........................................................................... 40

New York Public Health Law § 230(10)(d-1) .................................................................. 55

New York Public Health Law § 230(10)(f) ............................................................ 23, 41, 45

## OTHER AUTHORITIES

8 NYCRR § 24.7(a)(2) ..........................................................................................................49

New York Rule of Professional Conduct 4.1 .....................................................................12

New York Rule of Professional Conduct 8.4 .....................................................................12

Patricia T. Aalseth, Medical Coding: What It Is and How It Works (2005) .......................6

Practicing Law Institute, *Developments in Consumer Fraud Class Action Law* (1998)...30

The Board for Professional Medical Conduct 2007 Annual Report..................................46

Plaintiff Gary Tsirelman respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss.

## PRELIMINARY STATEMENT

This case addresses the relatively narrow question of what federal due process requires when New York State accuses a physician of professional misconduct based primarily on fraud allegations. In particular, it asks whether the greater risk of error and harm in fraud-based misconduct cases should be acknowledged and addressed with: 1) an intermediate rather than the minimum standard of proof; 2) evidentiary rules that provide basic safeguards for relevance, reliability, and fairness; and 3) compliance with procedural rules in effect while the case is active or under direct review. The facts of Plaintiff's case illustrate why these procedural protections must be provided, and why Defendants' failure to do so entitles Plaintiff to redress for violations of his due process rights.

Plaintiff was a doctor who, for less than a year between August 2000 and July 2001, held an ownership stake in a Brooklyn medical clinic. The clinic used a separate management company called Flatlands to handle logistical matters such as billing and medical coding, which is the process of selecting standardized codes that best correspond to medical diagnoses and treatments. Aside from providing his medical notes to Flatlands, Plaintiff had no involvement in the specialized coding process. While practicing medicine during this brief ownership stint, Plaintiff sometimes performed a non-invasive pain management procedure known as synaptic therapy that works by temporarily disrupting the ability of nerves to transmit pain signals using electrical pulses.

1

Using their independent judgment, Flatlands' coding staff prepared insurance bills for synaptic therapy by selecting two medical billing codes corresponding to different parts of the therapy. This was consistent with a common interpretation of these codes among synaptic therapy providers at the time. Flatlands intended one code to cover the work of sizing, selecting, and placing electrodes properly on patients. The second code described the active operation of the synaptic therapy device and patient monitoring during the treatment. To avoid confusion, Flatlands appended medical records related to the synaptic therapy to its bills. Over the next few years, however, the consensus among medical coders changed such that the second code that had previously been used to describe synaptic therapy was no longer considered correct for that purpose.

In 2007, roughly six years after Plaintiff had stopped working as a physician and started a career in law, Defendants initiated professional misconduct proceedings against Plaintiff. They alleged primarily that Plaintiff had defrauded insurers by submitting bills with the wrong codes. Plaintiff sought to explain that when Flatlands first prepared the bills in question, they contained the most appropriate "best fit" codes corresponding to the synaptic therapy, consistent with a consensus at that time among medical coders. Moreover, to avoid confusion, Flatlands had submitted medical records showing the exact treatment performed along with the billing codes, belying the conclusion that either Flatlands or Plaintiff had attempted to deceive insurers regarding the treatments he had administered. There was also no allegation or evidence that insurers had, in fact, been deceived. In any event, Plaintiff could not have had any intent to defraud – as Flatlands' billing staff testified, he was simply not involved in the specialized task of translating his medical notes into medical billing codes.

2

Unfortunately, at the time of his hearing, Plaintiff was unable to gather evidence from other synaptic therapy providers or medical billers regarding their shared billing code practices, and Defendants refused to provide any such exculpatory evidence in their possession. Defendants' evidentiary rulings separately prevented Plaintiff from establishing effectively his lack of involvement in the clinic's billing process, and the honest nature of all his communications. And Plaintiff's credibility was damaged by his failure to remember all details of the clinic's business, which he had left six years prior, and by Defendants' misinterpretation of his subsequent, limited work as an attorney for the clinic. Defendants therefore inferred, based only on a "preponderance" of circumstantial evidence, that Plaintiff had somehow intentionally attempted to defraud insurers through the choice of billing codes for synaptic therapy, where that choice was made by a separate management company hired by the clinic. Plaintiff's appeals in the New York courts resulted in the annulment of some of Defendants' charges, and affirmance only of charges related to Plaintiff's synaptic therapy bills. Defendants revoked Plaintiff's medical license and imposed a fine.

This case addresses the adequacy of procedures used by Defendants in medical disciplinary hearings based primarily on allegations of fraud, such as Plaintiff's hearing. As several state supreme courts have found, due process requires that all medical discipline proceedings utilize a more demanding "clear and convincing" standard of proof. But Plaintiff's challenge is narrower than this. It extends only to a proposition that a majority of courts and states agree (or likely agree) with – that proceedings *based on allegations of fraud* must utilize this intermediate standard of proof. Because New York uses the weaker "preponderance" standard for all medical discipline cases,

3

including those based on allegations of fraud, it fails to satisfy due process both facially and as-applied to Plaintiff.

Defendants' failure to utilize any rules of evidence in these proceedings to prevent the admission of irrelevant, unreliable, and unfair evidence compounds the potential for harm from erroneous license revocations, and separately violates due process. And contrary to Defendants' arguments, Plaintiff's claims are largely, if not entirely, unaffected by principles of preclusion and abstention.

Plaintiff also challenges Defendants' failure to maintain a procedural mechanism for complying with procedural rules in effect while Plaintiff's hearing was under direct judicial review. Shortly after Defendants reached their decision in Plaintiff's case, but before the New York courts had completed their review of this decision, the New York legislature amended the New York Public Health Law to impose on Defendants a continuing requirement to produce exculpatory evidence to accused physicians. Plaintiff requested such evidence pursuant to this amended provision – in particular, seeking evidence that the clinic's choice of billing codes was correct and consistent with the practice of other providers – but Defendants again denied this request, citing the absence of a procedure for their administrative judges to reopen cases such as Plaintiff's. Defendants instead suggested that Plaintiff seek a favorable exercise of discretion using an application to reconsider the results of his hearing. Defendants' failure to provide a nondiscretionary mechanism for complying with procedural requirements affecting fairness, such as the requirement here, also violates Plaintiff's due process rights.

For the foregoing reasons, and for the reasons explained more fully below, Defendants' motion to dismiss should be denied in full.

4

## COUNTERSTATEMENT OF THE CASE[1]

*Plaintiff's Work as a Physician at LaMed Medical, P.C.*

For less than one year, between August 2000 and July 2001, Plaintiff held an ownership stake in a small medical clinic named LaMed Medical P.C. ("LaMed"). Compl. ¶ 11. Plaintiff's only prior involvement with LaMed had been quite limited – during an approximately three-month period in 1997-98,[2] he spent roughly four hours per week assisting a former LaMed owner with new patients. This owner later offered a stake to Plaintiff, who hoped the clinic would provide an environment in which he could focus on patients with minimal distractions from the onerous management, insurance, and financial aspects of medicine.

To this end, Plaintiff sought assurances that the basic logistics of the practice – general management, upkeep, billing, etc. – would be delegated to a separate management firm. A company called Flatlands Best ("Flatlands") had provided these management services to LaMed prior to Plaintiff's ownership stint, and it continued to do so during and after Plaintiff's ownership.[3] Notably, Flatlands was responsible for preparing bills to be submitted to insurers based on the notes and records written by physicians at LaMed, including Plaintiff. Compl. ¶ 12-13.

---

[1] The facts essential to Plaintiff's claims and Defendants' Motion To Dismiss are contained in the Complaint. This Memorandum includes additional background information that is helpful for understanding the facts underlying this case, but that should not be strictly necessary for resolving Defendants' motion. However, to the extent this Court deems any information contained only in this Memorandum to be necessary for the Complaint to survive Defendants' motion, Plaintiff requests leave to amend the Complaint accordingly.

[2] Plaintiff received his medical license in 1996. Compl. ¶ 3, 11.

[3] Plaintiff at no time controlled or had any ownership interest in Flatlands.

*Plaintiff's Use of Synaptic Therapy*

While a physician with LaMed, Plaintiff occasionally performed a pain control treatment known as synaptic therapy. Compl. ¶ 21. This is a non-invasive, drug-free nerve therapy used to treat both acute and chronic pain. It relies on a device that delivers electrical impulses of varying frequency to areas of pain.[4] Neurons transmit messages, such as pain signals, electrochemically,[5] and these signals may be muted by exhausting the ability of neurons to generate an electric signal. A synaptic therapy device does this by electrically stimulating neurons in a particular way. This stimulation temporarily changes the balance of chemicals in or near the neuron so that it can no longer transmit signals, including pain signals. In sum, synaptic therapy is designed to disable a nerve's ability to transmit pain, but to do so non-invasively, without drugs, and only temporarily.

LaMed acquired a device for purposes of offering the synaptic therapy around the time that Plaintiff began his brief ownership stint in 2000.

*The Medical Billing Process*

A central underlying issue in this case is Plaintiff's knowledge and intent as to medical bills submitted by LaMed to insurers. It may therefore be helpful to provide a brief background of the medical billing process – medical coding in particular.

Medical coding is, in essence, "translation." *See* Patricia T. Aalseth, Medical Coding: What It Is and How It Works (2005), at viii. Through the coding process, a

---

[4] A general description of the therapy is available at the website of The Synaptic Corporation, which currently markets and sells devices and supplies for synaptic therapies. *See generally* Synaptic SEA Poster, *at* http://www.synapticusa.com/Synaptic%20SEA%20Poster.pdf
[5] For a basic description of how neurons work, *see generally* Eric H. Chudler, Neuroscience For Kids – Action Potential, *at* http://faculty.washington.edu/chudler/ap.html.

6

physician's "medical documentation about the diagnoses and procedures related to a patient" is converted "into a series of code numbers that describe the diagnoses or procedures in a standard manner." *Id.* This coding process is the "key step" required to receive payment for providing health care. *See* American Academy of Professional Coders, What Is Medical Coding, *available at* http://www.aapc.com/resources/medical-coding/index.aspx.

The medical coder "is primarily responsible for accurately coding the claims." He or she does so by "check[ing] a variety of sources within the patient's medical record . . . to verify the work that was done." *Id.* Medical coding requires familiarity with insurance plans, regulations, and large libraries of standard codes corresponding to specific medical procedures and diagnoses, and guidelines for using those codes. *See id.* As should be apparent, medical coding is "extremely complex." Aalseth, *Medical Coding, supra*, at 144. Rules for coding may be "different, depending on the site of service, and who is submitting a bill." *Id.* Significantly, "[b]ecause there are areas of coding that are open to interpretation, it is often the case that coding errors are mistakes, not intentional." *Id.*

Because medical coding is a specialized field that requires specific skills and training, physicians generally leave the coding process to specially trained staff. Physicians provide treatment notes and medical records to their coding and billing staff, but leave the coding details to these separate professionals.

*Flatlands' Preparation of Synaptic Therapy Bills*

Flatlands provided these coding and billing services to physicians at LaMed, including Plaintiff, who believed Flatlands possessed the necessary expertise for medical

7

coding and billing. After performing synaptic therapy, Plaintiff would provide his notes regarding the treatment to Flatlands. Flatlands would in turn translate the treatment into billing codes for submission to insurers. Plaintiff had no involvement with the preparation of bills, and he did not direct Flatlands as to the billing codes to use for particular treatments. Plaintiff could not have done so in any event, as he had little familiarity or expertise in the complexities of medical coding and billing. Compl. ¶¶ 22-24.

Billing was particularly complex with respect to synaptic therapy, for there was no single billing code that corresponded directly to it. Flatlands therefore prepared bills using multiple codes that together approximated the treatment the Plaintiff actually provided. To avoid confusion, Flatlands would also append copies of any appropriate and corresponding medical records to the bills so that insurers would know exactly what therapy Plaintiff had provided. Compl. ¶ 24. It is worth emphasizing again, however, that Plaintiff had no involvement in how Flatlands translated his medical notes into bills, or in precisely how Flatlands prepared the bills and presented them to insurers. While he was a physician, Plaintiff merely submitted his notes and records to Flatlands, who in turn and on their own, would generate billing codes and bills for insurers and patients. Compl. ¶¶ 22-23.

To Plaintiff's understanding, Flatlands billed insurers for synaptic therapies as accurately as possible, given the practices and customs of other synaptic therapy providers in 2000 and 2001, and as late as 2004. Because no single billing code fully and accurately described this therapy (the device used for synaptic therapy had only recently been approved and marketed), Flatlands communicated the procedure to insurers by using

8

a series of "best fit" codes, and by attaching medical records regarding the procedure actually performed. Compl. ¶¶ 24-25.

As Plaintiff's bills indicate, each time Plaintiff performed synaptic therapy at a particular nerve location (usually either the shoulder/neck area, or the lower back or legs), Flatlands listed two billing codes to describe the work Plaintiff performed. Flatlands intended Current Procedural Terminology (CPT) code 64550 to describe the process of selecting appropriate electrode pads and attaching these pads to the correct location on the patient's body. This code was then coupled with one of either 64613 or 64622,[6] depending on the electrode location. The 64613 and 64622 codes described Plaintiff's setup and operation of the synaptic therapy device, his monitoring of the patient during the procedure, electrode removal, and his time spent documenting the outcome of the session. The medical record attached to the bill confirms the dates of treatment and the nerve locations treated, and it makes clear that Plaintiff performed a non-invasive synaptic therapy with only temporary effect. *See* Tsirelman Aff., Ex. A. As should be clear, Flatlands' use of two billing codes for each synaptic therapy application was not, and was never intended to be, "double billing." Rather, based on Flatlands' best interpretation, these two codes described the steps of the synaptic therapy most fully and accurately.

---

[6] CPT is a medical nomenclature for reporting medical procedures and services. CPT code 64550 currently corresponds to "Application of surface (transcutaneous) neurostimulator." CPT code 64613 currently corresponds to "Chemodenervation of muscle(s); neck muscle(s) (eg, for spasmodic torticollis, spasmodic dysphonia)." CPT code 64622 currently corresponds to "Destruction by neurolytic agent, paravertebral facet joint nerve; lumbar or sacral, single level." CPT code 64640 currently corresponds to "Destruction by neurolytic agent; other peripheral nerve or branch." *See* American Medical Association, CPT Search, *at* https://catalog.ama-assn.org/Catalog/cpt/cpt_search.jsp.

9

The two codes Flatlands used to describe the active operation phase of the synaptic therapy device – 64613 and 64622 – also may describe permanent "nerve destruction procedures" (NDP), which Plaintiff at all times freely acknowledged he never administered. However, at the time the bills were prepared, many medical coders interpreted these NDP codes to include temporary, non-invasive nerve therapy, which accurately described the synaptic therapy that Plaintiff performed and which reflected a similar level of work on the part of the physician. So in conjunction with the other billing codes and attached records indicating exactly what work had been done, Flatlands' bills

clearly were intended only to communicate that Plaintiff had administered synaptic therapy – a therapy for which no specific billing code existed – once for each nerve location and date shown on the accompanying medical records.

This selection of billing codes for synaptic therapy was common during the 2000-01 period in question, and for some time after. For instance, other synaptic therapy providers whose bills were questioned by insurers sometimes sought arbitration for these bills. Peer review documents submitted in such proceedings show that the various steps for treatment were fully described using five separate codes almost identical to those used by Flatlands – 64550 coupled with 64640, 64613, 64622, or 64555, depending on nerve location. *See* Leone Aff., Ex. 4, at 174. These codes include some that encompass permanent NDPs because these were deemed "best fit" for synaptic therapy. They were also understood to encompass the kind of temporary nerve function destruction accomplished by synaptic therapy. Similarly, a May 2003 article observes that the major

documents, this article recommends coding this procedure using certain NDP codes, noting that even though the nerve is only temporarily disabled, these codes are proper because "the anesthesiologist's scope of work remains the same and, for all practical purposes, the nerve is destroyed and function is lost for a prolonged period." *See* Tsirelman Aff., Ex. B..

*Plaintiff's Legal Representation of LaMed*

Prior to Plaintiff's brief ownership of LaMed, Plaintiff had attended law school, graduating from Brooklyn Law School in June 2000. Compl. ¶ 14. He was admitted to the New York State bar in June 2001. Compl. ¶ 15. After receiving his law license, Plaintiff opted to pursue a legal rather than medical career. He therefore gave up his ownership stake in LaMed and transferred all of his prior responsibilities to another physician in July 2001. Compl. ¶ 14.

As an attorney, Plaintiff developed a practice that focused initially on representing physicians seeking reimbursement and payment on insurance claims. This practice area was a natural one for Plaintiff to pursue given his medical experience and contacts in the local medical community. These contacts included former colleagues and associates at LaMed and Flatlands, who naturally felt comfortable hiring Plaintiff to represent them in their disputes with insurers over reimbursement claims. Compl. ¶ 16.

In his new role as an attorney, Plaintiff's relationship with LaMed changed considerably. He did not practice medicine and was no longer a physician-owner of LaMed. Rather, he was an attorney who counted LaMed as one of his clients, and whose legal interests he advocated as effectively as possible. As always, Plaintiff had no

involvement with LaMed's billing process in the first instance. He neither prepared LaMed's bills nor submitted them to insurers. Compl. ¶ 22.

As with Plaintiff's other clients, his role was limited to defending LaMed's bills if challenged by insurers, and arguing in favor of full payment based on information and records provided by LaMed. In the course of this representation, there were a few instances in which he advocated for full payment of LaMed bills for synaptic therapy that contained the later-disputed billing codes.

Notably, in this new role as attorney, Plaintiff's position was inherently adversarial to that of his insurer opponents and encompassed an ethical duty to advocate LaMed's interests. This was in sharp contrast to his prior role as a medical provider, where his role was merely informational and indirect – he informed Flatlands of the procedures he had performed, and Flatlands in turn processed this information into bills to submit to insurers.

Both professions prohibit dishonest and fraudulent conduct, of course,[7] and Plaintiff at all times adhered to the rules governing these professions. But these roles are distinct and advance different goals. It is therefore important to recognize the high probability for error in attempting to infer a physician's intent when submitting bills to an insurer, from a negotiation or litigation position he advocates years later as an attorney.

---

[7] *See* New York Rule of Professional Conduct 8.4 ("A lawyer or law firm shall not . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . ."); New York Rule of Professional Conduct 4.1 ("In the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person."); New York Education Law § 6530(2) (defining professional medical misconduct to include "[p]racticing the profession fraudulently").

12

*Defendants' Charges Against Plaintiff*

In February 2007, over five years after Plaintiff had stopped practicing medicine and given up his ownership stake in LaMed, Defendants brought professional misconduct charges against Plaintiff. These charges were based almost entirely on the allegation that Plaintiff had attempted to defraud an insurer, Allstate, by billing for procedures – permanent nerve destruction procedures ("NDPs") that had not actually been performed. Compl. ¶¶ 17-18. Notably, these charges were not based on complaints from any of Plaintiff's former patients concerning the care they received or on any lack of skill or competence on Plaintiff's part. The charges stemmed only from Allstate's and Defendants' belief that bills bearing Plaintiff's name – which had been prepared and submitted by Flatlands – did not reflect treatments actually performed. *Id.* There was no allegation that Allstate had, in fact, been deceived into believing that Plaintiff had performed permanent NDPs.

Defendants also brought contradictory charges alleging that the permanent NDPs and other treatments, though not performed, nonetheless constituted excessive or inappropriate treatment. In other words, Defendants essentially accused Plaintiff both of not performing certain medical procedures (but billing for them) and also of performing these same medical procedures (but unnecessarily). *See* Nemerson Aff., Ex. 1 at App'x 1.

*Proceedings Before the Hearing Committee*

A three-person Hearing Committee composed of two doctors and one PhD-holder considered Defendants' charges. *See* Nemerson Aff., Ex. 1 at 1. Plaintiff's response to these charges was and remains straightforward, as described below. Unfortunately,

13

Plaintiff was unable to present his explanation effectively due to the considerable procedural hurdles imposed over the course of Plaintiff's hearing – notably, the admission of incomplete and uncertified evidence, Defendants' refusal to provide exculpatory evidence in its possession, the use of a standard of proof too lenient for charges of fraud, and a host of other defects not directly relevant to this case.

Defendants maintained these hurdles despite the grave nature of professional license revocation and, more importantly, the serious and irreversible effects of Defendants' fraud accusations – both of which impair or preclude Plaintiff's ability to sustain his livelihood. Under these defective procedures, the Hearing Committee proceeded to determine the fate of Plaintiff's career and livelihood.

Defendants' core accusation was that Plaintiff fraudulently attempted to deceive insurers by indicating on his bills that he had performed permanent NDPs when Plaintiff did not, in fact, perform such NDPs. To be sure, Plaintiff freely acknowledges that he did not perform NDPs on the patients in question. He administered only synaptic therapy, for permanent NDPs would indeed have been excessive and inappropriate in those circumstances. Compl. ¶ 21.

The critical point for his case, however, was that the bills prepared by Flatlands for Plaintiff did not actually indicate that permanent NDPs had been performed. To the extent they might have, Plaintiff never intended to do so. As previously explained, at the time Flatlands prepared these bills, there was no single billing code that corresponded to the synaptic therapy Plaintiff administered. It was therefore common practice in 2000 and 2001 to describe this synaptic therapy using a series of "best fit" billing codes and to append the relevant medical records to bills sent to insurers. Taken together, these codes

14

and attached records were meant to communicate performance of the synaptic therapy that Plaintiff had provided – not to communicate the performance of permanent NDPs. Compl. ¶¶ 23-24.

The bills that Flatlands prepared were therefore neither "false" nor "doubled", but merely a common way to bill for this kind of synaptic therapy during this time period, when no single medical billing code fully and accurately described the therapy. Flatlands followed this practice when preparing bills under Plaintiff's name, in the course of translating Plaintiff's synaptic therapy notes into the medical billing codes at issue here. Compl. ¶¶ 23-24. Given the lack of precision in the available billing codes, some insurers may have initially misinterpreted the bills to include permanent NDPs, though even a cursory review of the medical records attached to those bills would have revealed that this was clearly not the case. Moreover, it was never Plaintiffs' intent to communicate such a fact.[8]

Even if Flatlands' billing practices in 2000 and 2001 as to synaptic therapy were incorrect, Plaintiff at no point intended to deceive or defraud insurers as to this therapy. As a physician, he merely relayed the details of his synaptic therapies to Flatlands, whom

---

[8] This explanation of Plaintiff's billing codes is straightforward, but apparently was not understood by the Hearing Committee. As their decision indicates, the Committee incorrectly assumed that Flatlands' use of two billing codes per procedure was an improper "double billing," when in fact Flatlands intended the two billing codes to simply describe two distinct phases of the synaptic therapy. *See* Nemerson Aff., Ex. 1 at 42, 47. They also incorrectly assumed that Flatlands' listing of codes 64613 and 64622 corresponded only to permanent NDPs, even though these codes were also interpreted to include temporary nerve-function destructions at the time the bills were prepared. *See id.* at 42-43. These errors likely arose because: 1) the Hearing Committee included no medical billing or coding experts; and 2) the Hearing Committee largely disregarded testimony from the only witness with medical coding expertise – Elana Rodriguez.

15

he trusted to generate bills as appropriate without requiring further input from him. Compl. ¶ 23. And even in his later role as an attorney representing LaMed, Plaintiff never asserted with respect to his bills that permanent NDPs had been performed. Rather, he simply argued that that the bills prepared by Flatlands comported with billing conventions that were common when the bills were prepared in 2000-2001, and should have been paid as such. According to these conventions, the bills in question at no point communicated, or were intended to communicate, that permanent NDPs rather than synaptic therapy had been performed.

Procedural defects stymied Plaintiff's attempt to present this explanation effectively to the Hearing Committee throughout the hearing and review process. Even though Plaintiff was faced with charges based on fraud, which in most circumstances demands a heightened degree of proof, the Hearing Committee utilized incomplete and uncertified medical and billing records as evidence of this fraud and required that Defendants prove fraud only with a weak "preponderance" standard. Compl. ¶¶ 9, 26. Moreover, the Committee placed the burden of producing complete records on Plaintiff, even though Plaintiff neither possessed nor was custodian of these records. Nemerson Aff., Ex. 1 at 47. Finally, Defendants refused to produce exculpatory evidence in their possession, even though the New York legislature passed legislation requiring such production that took effect while this matter was still under review in the New York state courts. Compl. ¶¶ 57-62.

These procedural defects proved fatal to Plaintiff's efforts to defend against Defendants' charges of fraud. For instance, one critical point Plaintiff sought to establish was that Flatlands' practice of billing for synaptic therapy using a series of "best fit"

16

medical billing codes was common and accepted practice. Because Plaintiff was no longer associated with LaMed, and no longer worked with Flatlands, he had no ready access to such evidence. However, Defendants likely have evidence that other synaptic therapy providers used the same "best fit" billing codes, yet Defendants refused to make such evidence available to Plaintiff for his defense despite its exculpatory nature.

Similarly, Defendants' use of incomplete and uncertified medical record evidence greatly hampered Plaintiff's effort to establish his lack of intent to defraud. Complete records would have further supported, among other things, Plaintiff's contentions that: 1) he at no point instructed Flatlands to bill insurers for permanent NDPs when none were performed; 2) he never ordered excessive or unnecessary treatments; and 3) he had no involvement with Flatlands' billing process while a physician with LaMed. They would have shown that Plaintiff at no point represented to any party – including Flatlands and insurers – that permanent NDPs had been performed. And critically, such documentary evidence of these facts would have greatly bolstered Plaintiff's credibility before the Hearing Committee. Because the Hearing Committee inferred fraud from its opinion that Plaintiff lacked credibility, the absence of evidence tending to corroborate his testimony and therefore bolster his credibility proved critical.

Equally importantly, had a full set of reliable, complete medical records been available to the Hearing Committee, the testimony of key witnesses would have changed, along with the Committee's reception and interpretation of that testimony. Dr. Joseph Carfi, a key expert witness on whose testimony the Hearing Committee relied heavily, admitted that his analysis and testimony would have changed had he reviewed the full set of medical records. Compl. ¶ 27. Such evidence would also have corroborated testimony

17

of Elena Rodriguez, who was the only medical coding specialist who testified. She established that Plaintiff had no involvement in Flatlands' billing process or choice of billing codes, and that the bills did not and were never meant to indicate that permanent NDPs had been performed. In the absence of corroborating evidence, the Hearing Committee found Ms. Rodriguez's testimony to be "limited in value," even though she provided the only detailed testimony as to Flatlands' billing procedures and Plaintiff's limited interaction with the billers – critical facts relevant to Defendants' fraud charges. Compl. ¶ 30.

The lenient "preponderance" standard of proof applied to Plaintiff's hearing also affected the outcome. For instance, the Committee did not even consider whether the set of billing codes used by Flatlands, supplemented by attached medical records, communicated anything beyond the performance of a single synaptic therapy. Rather, the Committee merely assumed that the NDP codes referred only to permanent NDPs and not to any portion of synaptic therapy, despite the prevalence of contrary interpretations of those codes at the time. *See, e.g.*, Leone Aff., Ex. 4, at 174. Similarly, the Committee reached its finding of fraudulent intent based on questionable inferences as to Plaintiff's credibility – namely, his inability to remember operational details of LaMed that occurred over six years ago, and the negotiating positions he later took as an attorney for LaMed. The Committee imputed fraudulent intent to the preparation of bills while Plaintiff practiced as a physician by relying on these tenuous inferences and, significantly, by ignoring direct evidence from Plaintiff's biller at Flatlands (Ms. Rodriguez) who testified under oath that Plaintiff had no involvement with the coding decisions. A "clear and convincing" standard of proof would have required the Committee to avoid making such

18

questionable inferences, and to consider fully the evidence supporting Plaintiff's innocent intent.

Defendants' evidence against Plaintiff was weak, at best, as revealed by the Hearing Committee's refusal to sustain any charges – even under its lenient evidentiary rules and burden of proof – except those related to the allegedly billed-but-not-performed NDPs. Strangely, the Committee also sustained charges of excessive or unnecessary treatment using NDPs. This latter finding, which required evidence that Plaintiff had ordered or performed NDPs, largely contradicted the separate charges of fraud that the Committee sustained, which asserted that NDPs had not been provided at all. Nemerson Aff., Ex. 1 at 34-35.

Had the Committee relied only on complete and reliable evidence, seen exculpatory evidence from Defendants, and applied an appropriate standard of proof, it is doubtful that the Committee could have sustained any of Defendants' charges. Nonetheless, based on the charges that were sustained, the Hearing Committee, on December 5, 2007, revoked Plaintiff's medical license, fined him $100,000, and indicated its intent to notify the appropriate attorney grievance committee of its fraud findings. Nemerson Aff., Ex. 1 at 49, 52-53.

*Article 78 Review*

On December 13, 2007, Plaintiff sought review of the Hearing Committee's decision in an Article 78 proceeding in the Appellate Division, Third Department. The Appellate Division returned its decision on April 9, 2009. Because there was, in fact, no evidence that Plaintiff had ever ordered or performed NDPs aside from bills that Defendants alleged were false, the Appellate Division correctly annulled the Hearing

19

Committee's charges related to excessive or unnecessary treatment. The Appellate

Division affirmed the charges of fraud, however, based on its deference to the

Committee's credibility findings – and, critically, despite the absence during the hearings

of complete medical record evidence, which would have bolstered Plaintiff's credibility.

Compl. ¶¶ 33-36.

Plaintiff subsequently moved for reargument, or leave to appeal to the Court of

Appeals, before the Appellate Division. The Appellate Division denied Plaintiff's

motion on June 26, 2009. Plaintiff then sought leave to appeal to the Court of Appeals,

which was denied by the Court of Appeals on October 22, 2009. Compl. ¶¶ 37-38.

*Plaintiff's Attempts to Obtain Exculpatory Evidence from Defendants*

Plaintiff has made numerous attempts to obtain exculpatory evidence from

Defendants, to no avail and despite statutory changes making it mandatory for such

evidence to be provided. Plaintiff made his initial request in 2007 during proceedings

before the Hearing Committee. The Administrative Law Judge (ALJ) presiding over the

hearing denied this request, however, citing *DiBlasio v. Novello*, 814 N.Y.S.2d 51 (1st

Dep't 2006), for the proposition that the statutes and regulations then in effect provided

no right to such exculpatory evidence. Compl. ¶¶ 55-56.

Effective November 3, 2008, while review of the Hearing Committee's decision

was still pending in Plaintiff's Article 78 proceeding in the New York state courts, the

New York legislature amended the Public Health Law to require the Department of

Health to provide exculpatory evidence on a continuing basis in cases of professional

misconduct. This change in the law occurred prior to decisions by the Appellate Division

20

in Plaintiff's case, but the Appellate Division did not address the availability of relief to Plaintiff under this provision. Compl. ¶¶ 57-58.

On July 28, 2009, while Plaintiff's motion for leave to appeal the Appellate Division's Article 78 decision to the Court of Appeals was still pending, Plaintiff made a motion before Defendants requesting that they fulfill their continuing obligation – now mandated by statute – to furnish Plaintiff with exculpatory evidence in their possession. Plaintiff provided examples of certain types of exculpatory documents, none of which he had access to at the time of his 2007 hearing dates. He requested that all such documents in Defendants' possession be produced, regardless of their age. Compl. ¶ 59. Defendants denied this motion three days later, and on November 6, 2009, shortly after the Court of Appeals denied Plaintiff leave to appeal, Defendants characterized their prior decision a "final ruling." Compl. ¶ 60; Nemerson Aff., Ex. 5.

Defendants explained that the decision whether to produce exculpatory evidence was essentially left to the discretion of OPMC's Director, notwithstanding PHL § 230(10)(d-1)'s clear language deeming such production mandatory – not discretionary. Plaintiff filed an Article 78 petition on February 16, 2010, seeking production of exculpatory evidence, and served this petition on OPMC on June 16, 2010.

## LEGAL STANDARD

Defendants have moved for dismissal of Plaintiff's complaint under Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure. In evaluating the motion under Rule 12(b)(6), this Court must "accept[] the allegations contained in the complaint as true and draw[] all reasonable inferences in favor of" Plaintiff. *Hayden v. Paterson*, 594 F.3d 150, 157 n.4 (2d Cir. 2010). The Court may reject allegations in the complaint only if "supported by mere conclusory statements." *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). As for Defendants' Rule 12(b)(1) motion, this Court does have the option of referring to evidence outside the pleadings, but in doing so, must provide a Plaintiff with an opportunity to conduct discovery on jurisdictional facts. A 12(b)(1) motion cannot, however, be converted into a Rule 56 motion. *See Gualandi v. Adams*, 385 F.3d 236, 245 (2d Cir. 2004).

## ARGUMENT

### I. New York's Use of the Minimum Standard of Proof for Fraud-Based Medical License Revocations Fails To Comply With Federal Due Process Requirements

Plaintiff challenges New York Public Health Law § 230(10)(f), which requires a "preponderance of the evidence" in all medical disciplinary proceedings, but Plaintiff limits this challenge to proceedings based primarily on fraud allegations. Federal due process requires a "clear and convincing" standard of proof in such proceedings in light of the important private and public interests in avoiding erroneous revocations, and the heightened cost of error stemming from such revocations. This requirement is consistent with the practices of a large majority of states. It also reflects the well-reasoned decisions of several state supreme courts that require, for federal due process purposes, "clear and convincing" evidence in all medical disciplinary proceedings – whether or not fraud is charged.

#### A. Plaintiff's Facial Challenge Is Limited to Medical License Revocation Charges Based on Fraud

At the outset, it should be emphasized that the scope of Plaintiff's facial challenges is much narrower than Defendants suggest. Plaintiff does not attack New York State's medical disciplinary hearing procedures in all possible applications. Rather, Plaintiff contends only that these procedures are inadequate and violate federal due process where: 1) the charges are based entirely or almost entirely on allegations of fraud; and 2) the Hearing Committee seeks to revoke or annul a physician's license.

In *John Doe No. 1 v. Reed*, 130 S. Ct. 2811 (2010), the Supreme Court acknowledged the propriety of facial challenges that, like Plaintiff's, are limited in extent. *Id.* at 2817. The plaintiffs in that case challenged Washington's Public Records Act

23

(PRA), which enables private parties to obtain copies of government documents, including referendum petitions. *Id.* at 2815. The PRA applies to all public records, but the plaintiffs limited their challenge to referendum petitions. *Id.* at 2817. The Supreme Court treated this challenge as a facial one, however, because it reached beyond the particular circumstances of the plaintiffs.

Because the challenge in this case reaches beyond Plaintiff's particular circumstances, it is properly characterized a facial challenge, albeit one with limited reach.[9] *See id.* So although this claim must satisfy the usual standards of a facial challenge, it need only do so "to the extent of that reach." *Id.* Therefore, this Court's due process analysis in this case need not, and should not, reach beyond the procedures for fraud-based medical license revocation challenged in this action.

> ### B. Courts Agree That Fraud-Based Medical License Revocation Charges Require Proof By Clear and Convincing Evidence

Plaintiff's limited facial challenge represents a well-accepted view in courts throughout this country. Several state supreme courts have explained that federal due process demands a "clear and convincing" standard of proof in all physician disciplinary hearings – whether or not the charges are based on fraud. More importantly for Plaintiff's challenge, it is the dominant view that erroneous fraud charges are uniquely

---

[9] Facial challenges are unavailable in Article 78 proceedings. *See University Club v. City of New York*, 842 F.2d 37, 40 (2d Cir. 1988) ("[C]onstitutional challenges to legislative enactments may not be raised in an Article 78 proceeding to review an administrative action."). Plaintiff's facial challenge is therefore cannot be barred by any principle of preclusion, *see, e.g., Hachamovitch v. DeBuono*, 159 F.3d 687, 695 (2d Cir. 1998) ("It is well settled that res judicata does not apply to bar a § 1983 action where a plaintiff has previously brought an Article 78 proceeding[; a plaintiff is] entitled to reserve his federal claim for the federal courts."), and Defendants do not argue otherwise.

harmful. A greater number of courts therefore make explicit their view that fraud-based disciplinary hearings must meet this higher standard of proof, even if ordinary disciplinary matters might satisfy due process with the lesser "preponderance of the evidence" standard. This dual view is implicit even among courts that explicitly tolerate the "preponderance" standard in ordinary physician discipline matters – few, if any, of these decisions preclude imposition of a higher standard for disciplinary actions alleging fraud.

### 1. Several State Supreme Courts Require an Intermediate Standard of Proof in Physician Disciplinary Hearings To Satisfy Federal Due Process Requirements

The proposition that federal due process requires a heightened standard of proof in physician disciplinary proceedings is solidly mainstream. The Supreme Court of Washington recognized this acceptance in *Nguyen v. Dept. of Health Med. Quality Assurance Comm'n*, 29 P.3d 689 (Wash. 2001). In holding that professional discipline for physicians requires the intermediate "clear and convincing" standard, the court recognized the trend of recent decisions "toward requiring the higher standard of proof." *Id.* at 691 n.3. Applying the U.S. Supreme Court's decisions in *Addington v. Texas*, 441 U.S. 418 (1979), and *Mathews v. Eldridge*, 424 U.S. 319 (1976), the court determined that a state could not deprive a physician of his professional license without applying a standard of proof appropriate to the state and individual interests at stake – the standard of proof being among the "primary" "safeguards to the citizen confronted by an action instigated against him by the state." *Id.* at 692 (citing *Addington* at 424).

The court observed that an "individual's interest in a professional license is profound," representing both a property interest and a liberty interest in protecting his

livelihood and reputation. *Id.* at 694. Because disciplinary proceedings are "quasi-criminal" – held for the public's protection, brought because of alleged misconduct, and unavoidably punitive – it would be "incongruous and contrary" to precedent to allow such quasi-criminal prosecutions to proceed "under the lowest standard of proof available." *Id.* at 695. The court could not accept discipline predicated on this lowest standard of proof in light of the significant risk of erroneous deprivation, as well as the state's interest in "medical disciplinary proceedings which reach an accurate and reliable result." *Id.* at 695-97.

The Washington Supreme Court's *Nguyen* decision fits comfortably into a line of decisions from other state supreme courts that reach the same conclusion – that due process requires an intermediate standard of proof in physician disciplinary proceedings. One year earlier, the Supreme Court of Wyoming, in *Painter v. Abels*, 998 P.2d 931 (Wyo. 2000), similarly recognized that "[a] clear and convincing burden of proof standard is normally used where civil proceedings against a licensee involve allegations of quasi-criminal wrongdoing (as in this case [of physician discipline])." *Id.* at 941. Balancing the three factors set out in *Mathews v. Eldridge*, the court determined that "the statutory preponderance standard fails to protect [the physician's] basic interests" and that "[d]ue process requires that the Board prove its disciplinary cases by clear and convincing evidence." *Id.*

In reaching this decision, the Wyoming Supreme Court invalidated a statute passed five years earlier that adopted a "preponderance" standard for discipline cases. *Id.* at 939. This was a significant decision, for under Wyoming law, "[s]tatutory enactments are presumed to be constitutional, and one who challenges a statute on constitutional

grounds bears the burden of showing the statute is unconstitutional *beyond a reasonable doubt*." *Id.* (emphasis added). The fact that Wyoming's highest court overturned a legislative enactment despite such a high standard of deference to the legislature indicates the degree and certainty with which a minimal "preponderance" standard of proof violates due process in medical disciplinary proceedings.

The Supreme Court of Oklahoma likewise observed that a preponderance of the evidence standard, being "generally the measurement used in private disputes" that "requires the parties to equally share the risk of error," is inappropriate "in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant." *Johnson v. Bd. of Governors of Registered Dentists*, 913 P.2d 1339, 1345 (Okla. 1996). Oklahoma's use of this standard in professional license disciplinary proceedings therefore "d[id] not comply with federal or state minimum constitutional due process requirements and [was] invalid." *Id.* at 1347. Constitutional due process instead required a "clear and convincing" standard of proof. *Id.*

Significantly, the Oklahoma Supreme Court rejected the argument that a preponderance standard passed due process muster simply because thirty-nine medical boards at the time required a preponderance standard, while eighteen required clear and convincing evidence. *Id.* at 1346. Because minimum due process requirements are a matter of federal law, they could not be diminished "'by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.'" *Id.* (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)). In other words, even if the preponderance standard is somehow presumptively valid, as Defendants argue, *see* Def. Br. at 12-13, federal due process requirements trump this

27

presumption because it is so clear that a higher standard of proof is required in physician disciplinary proceedings.

In addition to the decisions just discussed, many other state supreme courts and state appellate courts also require a heightened standard of proof in physician disciplinary proceedings. *See Silva v. Superior Court*, 17 Cal. Rptr. 2d 577 (Cal. Ct. App. 1993); *Ettinger v. Bd. of Med. Quality Assurance*, 185 Cal. Rptr. 601 (Cal. Ct. App. 1982); *Ferris v. Turlington*, 510 So. 2d 292 (Fla. 1987); *In re Zar*, 434 N.W.2d 598 (S.D. 1989); *Miss. State Bd. of Nursing v. Wilson*, 624 So.2d 485 (Miss. 1993); *Davis v. Wright*, 503 N.W.2d 814 (Neb. 1993). Unlike the decisions reached by the Supreme Courts of Washington, Wyoming, and Oklahoma, these decisions are not based explicitly on federal constitutional grounds. Rather, they rely on interpretations of state statutes and regulations or establish equivalent standards for disciplinary proceedings involving physicians and other professionals such as attorneys. These decisions nonetheless demonstrate the broad acceptance of the principle that medical disciplinary proceedings demand a standard of proof much higher than the minimal "preponderance" standard. This higher standard of proof is necessary in light of the important individual interests involved, the quasi-criminal nature of disciplinary proceedings, and the need for minimizing erroneous deprivations, among other reasons.

2. The Dominant View Is that Allegations of Fraud Require Proof by Clear and Convincing Evidence

Plaintiff's facial challenge does not require a decision as broad as those rendered by the supreme courts of Washington, Wyoming, and Oklahoma. Although their view is certainly a mainstream view (though perhaps a minority one), Plaintiff's challenge

actually reflects the dominant position that allegations based entirely or primarily on fraud must be proved using a higher standard of proof. Most states recognize that fraud charges – even in ordinary civil cases – have a unique character and therefore require clear and convincing evidence to sustain. In this vein, a number of states explicitly require that professional discipline charges based on fraud satisfy a heightened standard of proof. This is true even if other, non-fraud discipline matters are permitted to be resolved using the more lenient "preponderance" standard.

It is well-accepted that fraud is a particularly serious accusation that in most states requires a greater certainty of proof to sustain. *See, e.g.*, *Addington*, 441 U.S. at 424 (clear and convincing standard typical in "civil cases involving allegations of fraud or some other quasi-criminal wrongdoing"); *Fein v. Starrett Television Corp.*, 116 N.Y.S. 2d 571, 573 (1st Dep't 1952) ("Fraud is a serious charge, and the evidence necessary to establish it must be clear and convincing."). As one judge has explained his research on this subject:

> In reviewing the history of the use of the clear and
> convincing evidentiary standard in bankruptcy and out,
> what becomes clear is that judges as fact finders have been
> reluctant to conclude that someone has acted dishonestly
> based on a mere preponderance of the evidence. This has
> been particularly true in cases involving fraud. At bottom,
> use of the clear and convincing standard has been found
> appropriate where the actions complained of (e.g., fraud)
> are essentially criminal or involve moral turpitude.

*In re Cobley*, 89 B.R. 446, 452 (Bankr. E.D. Pa. 1988) (citation omitted). And Judge Posner, in a recent opinion, elucidated the logic underlying the higher standard in civil fraud cases:

> The tripartite division of burdens of proof – preponderance
> of the evidence, clear and convincing evidence, and proof

29

> beyond a reasonable doubt – has a certain logic. In an
> ordinary civil case, in which a prevailing plaintiff obtains
> only money, the consequences of error (which is always a
> risk in litigation) are symmetric: one party (the party that
> should have lost) is unjustly enriched, the other unjustly
> impoverished, by the same amount. At the other extreme,
> that of a criminal prosecution, the consequences to the
> contending interests are sharply asymmetric: a person
> unjustly convicted and sentenced to prison (or executed)
> incurs heavy costs of punishment, and the penal system
> incurs heavy costs of implementing punishment, whereas
> the only consequence of acquitting a guilty person is to
> reduce, usually rather modestly, the deterrent and
> incapacitative effects of the criminal law. In the
> intermediate case, that of a civil judgment for fraud, the
> consequences of error are slightly asymmetric. A judgment
> of fraud injures the defendant's reputation and may drive
> customers away and otherwise impair his ability to do
> business, and these costs are not a benefit to the plaintiff.
> The plaintiff gains a money judgment; the defendant loses a
> money judgment but incurs additional costs besides –
> therein lies the asymmetry.

*Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 499 (7th Cir. 2008).

Federal pleading requirements also reflect the serious nature of fraud charges and

the higher hurdles they must clear. Rule 9(b)'s particularity requirement serves, among

other purposes, to "safeguard a defendant's reputation from improvident charges of

wrongdoing." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *see also Vess v.*

*Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003) ("Fraud allegations may

damage a defendant's reputation regardless of the cause of action in which they appear . .

. .").

For these reasons, "[m]ost states . . . require plaintiffs to establish fraud by clear

and convincing evidence." *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d

522, 533 (9th Cir 1984); *see also* Practicing Law Institute, *Developments in Consumer*

*Fraud Class Action Law* (1998) (noting that only thirteen states utilize a "preponderance

of the evidence" standard for fraud, while twenty-seven states and the District of
Columbia require "clear and convincing" evidence, four require "clear and satisfactory"
proof, and six others use hybrid standards combining the concepts of "clear and
convincing" and "preponderance").

In medical disciplinary proceedings based primarily or entirely on fraud
allegations, many states likewise require clear and convincing evidence (or some
equivalent) to sustain the charges, even if they tolerate the minimal standard of proof in
other circumstances. The Supreme Court of New Mexico, for example, has explained
that while the usual standard of proof in administrative proceedings is a "preponderance
of the evidence," the higher "clear and convincing burden" applies "where allegations
such as fraud are involved." *Foster v. Bd. of Dentistry*, 714 P.2d 580, 581-82 (N.M.
1986). Similarly, in *Bernard v. Bd. of Dental Exam'rs*, 465 P.2d 917 (Or. Ct. App.
1970), the Court of Appeals of Oregon held that evidence in a medical license revocation
matter must be "clear and convincing" to sustain charges based on fraud or
misrepresentation. *Id.* at 924. This is true despite Oregon's tolerance of the
preponderance standard in other medical disciplinary proceedings. *See Gallant v. Bd. of
Medical Examiners*, 974 P.2d 814, 818 (Or. Ct. App. 1999). Even the dissenting judges
in Washington's *Nguyen* decision conceded that the higher standard may be required
"when there are allegations of fraud," even while disagreeing with the Washington
Supreme Court's holding that due process compelled the clear and convincing standard in
all physician disciplinary proceedings. *See Nguyen*, 29 P.3d at 702 (Ireland, J.,
dissenting).

In light of these decisions and the fact that most states require "clear and convincing" evidence in ordinary civil fraud cases, it is almost certain that a large majority of states would require this heightened standard of proof in disciplinary actions based primarily or entirely on fraud charges. The decisions of the highest state courts of Washington, Wyoming, and Oklahoma therefore establish a strong case that federal due process compels a "clear and convincing" standard of proof in all medical disciplinary proceedings regardless of the number of states that utilize this standard. Importantly for purposes of Plaintiff's challenge, it is even more clear that this higher standard must apply to the subset of medical disciplinary proceedings predicated on fraud — a result that

would be in line with the majority of the states. *See Rivera v. Minnich*, 483 U.S. 574, 579 (1987).

### 3. Defendants Cite No Authority Rejecting Plaintiff's Facial Challenge

Significantly, none of the cases cited by Defendants as upholding the preponderance standard addresses Plaintiff's facial challenge to fraud-based license-revocations in physician disciplinary proceedings. The Appellate Division's decision in *Gould v. Board of Regents of University*, 478 N.Y.S. 2d 129 (3d Dep't 1984), for example, did not involve any allegations of fraud, and its cursory approval of the preponderance standard has no relevance to this action. Similarly, in *Giffone v. De Buono*, 693 N.Y.S.2d 691 (3d Dep't 1999), the facts underlying the charges concerned not fraud, but rather "improper physical or sexual contact and/or utter[ance of] inappropriate comments or questions."[10] *Id.* The decision in *Bazin v. Novello*, 754

N.Y.S.2d 446 (3d Dep't 2003) is likewise irrelevant because the primary charge

concerned not fraud, but rather the inappropriate diagnosis and excessive treatment of

five patients.[11]   *Id.* at 446.   Moreover, the hearing reviewed in *Bazin* did not concern an

ordinary professional misconduct matter, but rather a violation of probation.   *Id.*

The non-New York cases cited by Defendants also address only the standard of

proof required in disciplinary proceedings not based on fraud.   *See N.D. State Bd. of Med.*

*Examiners v. Hsu*, 726 N.W.2d 216, 219 (N.D. 2007) (charges based on "pattern of

inappropriate care" for patients); *In re Grimm*, 635 A.2d 456, 458 (N.H. 1993)

(psychologist charged with "engaging in sexual relations" with a patient); *Ghandi v.*

*Wisc. Med. Examining Bd.*, 483 N.W.2d 295, 298 (Wisc. App. Ct. 1992) (physician

charged with "improperly touching the intimate parts of three female patients and with

other related sexual activity"); *Matter of Polk*, 449 A.2d 7, 10 (N.J. 1992) (physician

charged with "sexual abuse of five juvenile female patients").

Finally, neither the Second Circuit decision in *In re Theodore Friedman*, 51 F.3d

20 (2d Cir. 1995), nor the Eastern District decision in *In re Seymour Friedman*, No. MC-

93-0180, 1996 WL 705322 (E.D.N.Y. Nov. 26, 1996), concerning reciprocal attorney

discipline has much bearing on Plaintiff's facial challenge.   Because both of these cases

addressed only the question of reciprocal discipline in the federal courts, akin to a

collateral attack, the attorneys carried the abnormally greater burden of "demonstrat[ing]

by clear and convincing evidence that . . . the state procedures were wanting."   *In re*

---

physician's improper contact and interaction with his patients.   Any fraud was merely
ancillary to the primary wrongdoing.   *Id.*

[11] As in *Giffone*, the primary charges concerned the improper treatment of patients, with
an ancillary accusation of fraudulent billing added to address the bills for the same
improper treatments.

33

*Theodore Friedman*, 51 at 22 (citing *Selling v. Radford*, 243 U.S. 46, 51 (1917)). The distinctive procedural postures of those cases limit their relevance here.

> C. *Fraud-Based Medical License Revocations Require Heightened Procedural Safeguards in Light of the Significant and Irreparable Harm Resulting from Erroneous Revocations*

As the cogent analyses of the Washington, Wyoming, and Oklahoma supreme courts make clear, federal due process requires a "clear and convincing" standard of proof in all physician discipline proceedings. Plaintiff's narrower, more specific challenge – directed only at discipline proceedings based on fraud – is even more compelling in light of the stronger individual interest involved and the greater need to prevent erroneous results. Moreover, the higher standard of proof Plaintiff urges in this case would simply reflect a position already adopted in the clear majority of states.

The U.S. Supreme Court, in *Santosky v. Kramer*, 455 U.S. 745 (1982), confirmed that "in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Id.* at 755. The Court emphasized that "the degree of proof required in a particular type of proceeding is the kind of question which has traditionally been left to the judiciary to resolve." *Id.* at 755-56 (quoting *Woodby v. INS*, 385 U.S. 276, 284 (1966)) (internal quotation marks omitted).

Significantly for purposes of Plaintiff's challenge, the Supreme Court deemed the intermediate "clear and convincing" standard of proof "necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.'" *Id.* at 756.

34

Physician disciplinary proceedings based on fraud threaten both of these individual

interests, and therefore require at least an intermediate standard of proof.

As in *Santosky*, evaluation of the three factors set forth in *Mathews v. Eldridge*,

424 U.S. 319 (1976), compels this heightened standard of proof: "the private interests

affected by the proceeding; the risk of error created by the State's chosen procedure; and

the countervailing governmental interest supporting use of the challenged procedure." *Id.*

at 754 (citing *Lassiter v. Dep't of Social Services*, 452 U.S. 18, 27-31 (1981)). Compared

with ordinary disciplinary proceedings, those based on fraud harm a broader range of

private interests and carry a greater risk of error by turning critically on questions of

intent, yet trigger no greater governmental interest.

1. Fraud-Based Medical Discipline Harms Individual Liberty and Property
Interests

A physician whose license is revoked based on charges of fraud – the subject of

Plaintiff's facial challenge – suffers property and liberty losses far more grievous than

those at risk in ordinary disciplinary proceedings. This heightened degree of harm weighs

heavily in favor of a standard of proof greater than the minimal preponderance standard.

As an initial matter, the Second Circuit has already observed that professional

licenses represent a liberty interest in earning a livelihood. *See RRI Realty Corp. v.*

*Incorporated Village of Southampton*, 870 F.2d 911, 918 n.4 (2d Cir. 1989) ("[P]lantiffs

denied licenses required for pursuing a particular occupation . . . have a liberty interest in

earning a livelihood.") (citing *Wilkerson v. Johnson*, 699 F.2d 325 (6th Cir. 1983)). As

the Sixth Circuit has elaborated, "freedom to choose and pursue a career[] to engage in

any of the common occupations of life[] qualifies as a liberty interest . . . ." *Wilkerson*,

35

699 F.2d at 328 (internal quotation marks omitted). A physician's loss of license, after all, "destroys his or her ability to practice medicine, diminishes the doctor's standing in both the medical and lay communities, and deprives the doctor of the benefit of a degree for which he or she has spent countless hours and probably tens (if not hundreds) of thousands of dollars pursuing." *Nguyen*, 29 P.3d at 694.

Separately, it appears that the Eastern District in *In re Seymour Friedman*, which Defendants rely on for the contrary proposition, was not made aware of the Second Circuit's earlier discussion on this question. *See id.*, 1996 WL 705322, at \*7 (failing to cite or distinguish the Second Circuit's *RRI Realty Corp.* decision). That aspect of the decision should therefore be disregarded, and this Court should instead follow the Second Circuit in recognizing both physicians' property and liberty interests in their medical licenses.

Whether or not a physician's loss of a medical license represents a harm to liberty in addition to property interests standing alone, a revocation based on fraud charges surely qualifies as a devastating loss of individual liberty given the immense and irreparable reputational harm that fraud charges carry. A fraud finding leveled by the State, after all, reflects not only a judgment as to a physician's fitness to practice medicine, but also to their fitness to pursue almost any sort of occupation.

A medical license revocation based on charges of incompetence would certainly harm or destroy a physician's ability to work in the medical community. But such reputational harm is relatively well-cabined – a doctor's incompetence in medicine has little bearing on his or her ability to pursue successfully an alternative career in law or accounting. While such a doctor would have little hope of ever practicing medicine again

36

– a significant loss of liberty to be sure – that doctor would still have a number of promising career paths still open.

In contrast, the harm and stigma of a medical license revocation based on fraud extends well beyond the medical field. To label a physician a fraud is to question his or her basic honesty in almost any endeavor. A doctor whose license is revoked on this basis would almost certainly be unable to work as a doctor, a lawyer, an accountant, or even a cashier. Because the reputational harm stemming from fraud charges is so fundamental, the liberty interest at stake is correspondingly greater. The harm at issue here is exactly the sort of "adverse social consequence" or "stigma" that the U.S. Supreme Court has recognized as having "a very significant impact on the individual" and that requires "proof more substantial than a mere preponderance of the evidence" to inflict. *Addington*, 441 U.S. at 426-27. This conclusion is, of course, consistent with the standard of proof adopted by the clear majority of states for allegations of fraud.

In the same vein, a higher standard of proof is called for based on the enduring harm to a physician's liberty and property interests stemming from a fraud-based license revocation. As Defendants note, the permanency of a physician's loss or curtailment of an interest must be considered in a *Mathews v. Eldridge* analysis. *See* Def. Br. at 18 (citing *Santosky*, 455 U.S. at 758). Defendants incorrectly argue, however, that the loss at issue in Plaintiff's facial challenge has no necessarily permanent effect. But because the stigma of such a loss extends well beyond the medical field, the availability of a reinstatement procedure left to the discretion of a state official cannot possibly rehabilitate a disgraced doctor's reputation in full. A physician deemed a fraud would find himself at a permanent disadvantage in seeking employment of any sort, whether or

37

not he later regains his medical license, for such a finding acts as a permanent scar on such a person's reputation and honesty.

2. Defendants' Use of the Minimum Standard of Proof To Sustain Fraud-Based Discipline Heightens the Risk of Error and Improperly Allocates This Risk

To ascertain the appropriate standard of proof, this court must consider "both the risk of erroneous deprivation of private interests resulting from use of a 'fair preponderance' standard and the likelihood that a higher evidentiary standard would reduce that risk." *Santosky*, 455 U.S. at 761 (citing *Mathews v. Eldridge*, 424 U.S. at 335). In adversarial proceedings, such as the ones at issue here, "the relevant question is whether a preponderance standard fairly allocates the risk of an erroneous factfinding between these two parties." *Id.*

The minimal protection from error afforded by the preponderance standard makes it inappropriate where, as here, the state seeks to inflict grievous harm on a physician's property and liberty interests based in almost all cases on inferences of a physician's subjective intent drawn from circumstantial evidence. The preponderance standard also improperly allocates the cost of error, for physicians wrongfully branded as frauds bear the loss of their livelihood, reputation, and property. Error also deprives the public of a physician's much-needed services. These imbalances make clear that the intermediate "clear and convincing" standard of proof is the minimum required for due process.

Fraud charges are, by their nature, particularly prone to error. They therefore require a higher standard of proof, as most states agree. Fraud allegations demand greater care because the central question in such cases is the intent of the accused – whether there is "proof of either an intentional misrepresentation or concealment of a known fact."

*Ross v. State Bd. for Professional Medical Conduct*, 845 N.Y.S. 2d 162, 165 (3d Dept.

2007). It is well-known, however, that "[f]raudulent intent, by its very nature, is rarely

susceptible to direct proof and must be established by inference from the circumstances

surrounding the allegedly fraudulent act." *Kreisler Borg Florman Gen. Constr. Co. v.

Tower 56, LLC*, 872 N.Y.S. 2d 469, 471 (2d Dep't 2009) (emphasis omitted). And

ascertaining such intent is an inherently subjective exercise. *See, e.g.*, *Nat'l Westminster

Bank USA v. Weksel*, 511 N.Y.S. 2d 626, 630 (1st Dep't 1987) ("[T]he allegation of fraud

necessarily raises a question respecting the subjective intent informing the charged

party's conduct.").

Where grievous harm to individual property and liberty interests turns critically

on determinations of subjective intent, there is a significant danger that such harm will be

inflicted erroneously. As in this case, a fact-finder may easily misread the demeanor of a

key witness or draw an incorrect inference from disputed circumstances, or the accused

may simply lack the resources and skill to marshal a sufficient quantity of evidence. An

intermediate standard of proof, however, can ameliorate the danger of error by increasing

the evidentiary threshold required for an error to occur, and on a more general level, by

"impress[ing] the factfinder with the importance of the decision." *Addington*, 441 U.S. at

427.

A heightened risk of error might be tolerable if the costs of error were allocated

evenly between the State and those accused of fraud in their profession. But that is not

the case for the proceedings that Plaintiff now challenges. Unlike ordinary civil suits in

which the costs of error fall equally on the parties involved, the costs of erroneous fraud

determinations fall far more heavily on those accused by the state. A doctor, whose

39

license the state incorrectly revokes based on fraud, loses not only his livelihood in the practice of medicine but also his ability to earn a real livelihood in most other professions. He bears the false stigma of dishonesty, and suffers an immense loss to his liberty. Yet neither the state nor the public benefits to a corresponding degree from an erroneous finding of fraud. The state may earn a small fine and a modest gain in deterrence. But the state and the public also suffer a significant loss, for the qualified, yet wrongfully incapacitated, doctor can no longer provide much-needed medical care.

Where, as here, there is an asymmetry in how parties bear the costs of error, the standard of proof must allocate the risk of error accordingly. An intermediate "clear and convincing" standard of proof serves exactly this purpose, as Judge Posner explained in his opinion in *Ty Inc.*, 517 F.3d at 499. In contrast, as the Supreme Court has warned, the minimal preponderance standard is one that "by its very terms demands consideration of the quantity, rather than the quality, of the evidence may misdirect the factfinder in the marginal case." *Santosky*, 455 U.S. at 764. As in *Santosky*, the weight of the private interests at stake in fraud-based medical discipline cases makes "the social cost of even occasional error . . . sizable." *Id.*

Other aspects of New York's medical disciplinary procedures heighten the risk of erroneous fraud determinations. The Department of Health acts throughout the disciplinary process as investigator, prosecutor, and decision maker, which must affect the objectivity of its decisions at some level. *See* N.Y. Public Health Law § 230(1), (7); *see also Painter*, 998 P.2d at 941-42 ("The risk of error is high in a proceeding seeking to revoke a medical license . . . [and] the risk increases where the agency acts as investigator, prosecutor, and decision maker."). The Department may also bring fraud

charges repeatedly – physicians generally have no "double jeopardy" defense. *See Sokol*

*v. N.Y. State Dep't of Health*, 636 N.Y.S. 2d 450, 451 (3d Dep't 1996). And disciplinary

intent, and fact-finders' familiarity with medical evidence and standards is of little, if any, benefit to ascertaining intent accurately.

The question of the requisite standard of proof is largely independent of the procedures that shape the evidence to be considered by a fact-finder. The standard of proof must, in the end, reflect the proper allocation of error and "impress the factfinder" with the appropriate "importance of the decision" it faces. *Addington*, 441 U.S. at 427. The preponderance standard does not fulfill this purpose in the fraud-based disciplinary proceedings that Plaintiff now challenges. This standard therefore cannot be sustained.

3. The State's Interests Would Not Be Harmed by Applying an Intermediate Standard of Proof

New York undoubtedly has a compelling interest in protecting the health and welfare of its citizens, but Defendants offer no explanation why an intermediate standard of proof in cases based on fraud, which would reduce both public and private costs of error, would harm this interest.

To begin with, it should be obvious that the protection of New York citizens' health and welfare is served not only by removing incompetent, impaired, unethical, or negligent physicians, but also by minimizing erroneous removals that unnecessarily reduce the availability of scarce and much-needed medical services. When the state mistakenly revokes the license of a qualified physician, it undoubtedly inflicts substantial harm on the public's health and welfare by depriving the public of that physician's skills. Erroneous revocation also negates the public's substantial investment in developing a physician's medical skill in the first place.

An intermediate standard of proof in fraud cases reduces the likelihood of erroneous revocations, and it does so without imposing any significant practical or financial burdens on the state. A heightened standard of proof in a subset of medical discipline hearings would, after all, have no significant impact on the cost of conducting these hearings. There would be no appreciable change to the nature of such hearings, or to the cost or difficulty of conducting these hearings – the standard of proof comes into play only in the fact-finder's consideration of the evidence. This evidence would be the same in all cases, for ordinary prudence motivates all parties to present their best and most effective arguments and evidence regardless of the standard of proof.

Defendants seem to suggest that use of a heightened standard of proof in fraud-based disciplinary proceedings might increase the chance that a dishonest physician is erroneously permitted to continue the practice of medicine, thereby harming New York citizens' health and welfare. This is unlikely, for the state enjoys an asymmetric advantage in its ability to bring fraud charges repeatedly until it sustains its charges with clear and convincing evidence. This possibility would not, in any event, justify use of the minimal preponderance standard. Any increase in the number of practicing, dishonest physicians would be offset by a decrease in the number of honest, erroneously incapacitated physicians.

An intermediate standard of proof would produce no discernable harm or burden to New York's interest in protecting its citizens' health and welfare, and, in fact, would advance this interest by reducing the public costs of erroneous license revocations. These benefits, coupled with the grave harm to physicians' property and liberty interests in fraud-based investigations, the asymmetric burdens of erroneous findings, and the high

43

likelihood of error when ascertaining fraudulent intent using a preponderance standard, all lead to one inescapable conclusion: federal due process requires that fraud-based medical license revocations be established by clear and convincing proof.

The lesser "preponderance" standard falls short of minimal due process requirements in all fraud-based discipline proceedings. A heightened standard of proof, after all, has "both practical and symbolic consequences." *Santosky*, 455 U.S. at 764. It is the "prime instrument" for avoiding erroneous harm to both individual property and liberty interests, as well as to the public's health and welfare. *See id.* This standard is "one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate" fraud-based revocations will be made. *See id.* at 764-65. In other words, no matter the quantity or character of evidence presented in such a proceeding, due process demands application of at least an intermediate standard of proof to ensure that the risk of error is properly allocated between the parties. *See Addington*, 441 U.S. at 423. Any lesser standard violates due process under any circumstance in which the state seeks revocation of a medical license based on allegations of fraud. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). A defective standard of proof also permeates the challenged proceedings with inadequate process. *See City of Chicago v. Morales*, 527 U.S. 41, 55 (1999). Plaintiff's facial challenge must therefore succeed.

### D. The Absence of Any Evidentiary Rules Further Exacerbates the Other Procedural Defects of New York Medical License Revocation Procedures

New York's medical discipline proceedings lack any rules for screening evidence: "The [Hearing C]ommittee shall not be bound by the rules of evidence." N.Y. Pub.

Health L. § 230(10)(f). When reviewing such proceedings, New York courts therefore affirm all evidentiary decisions unless a ruling "infect[s] the entire proceeding with unfairness." *E.g.*, *Morfesis v. Sobol*, 567 N.Y.S. 2d 954, 955 (3d Dep't 1991). Under this standard, the Hearing Committee may consider evidence that is unreliable, irrelevant, or prejudicial, so long as the "entire proceeding" remains within the bounds of "unfairness." This standard may be acceptable for ordinary administrative matters where the private costs of error are low. It may also be acceptable in limited circumstances for criminal matters, where the standard of proof is high and there are codified rules of evidence that enforce standards of relevance, reliability, and prejudice.[12] But for medical fraud proceedings, where the private costs of error are high and where a minimal "preponderance" standard of proof applies, due process is not satisfied in the absence of at least minimal prospective evidentiary rules.

In fraud-based medical discipline hearings, important individual property and liberty interests are at stake, erroneous revocation deprives the public of scarce medical services, and, significantly, the nature of the charges requires the fact-finder to draw subjective inferences of fraudulent intent. Due process therefore requires a higher standard of proof; the use of prospective evidentiary rules that ensure all evidence is probative, reliable, and non-prejudicial; or both. If the minimal "preponderance" standard applies, then under *Mathews v. Eldridge*, it is not sufficient to annul medical fraud findings only if an "entire" proceeding is "infected with unfairness."

---

[12] This "infection" standard appears most often in federal court review of improper prosecutorial comments. *See, e.g.*, *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) ("Standing alone, a prosecutor's comments upon summation can so infect a trial with unfairness as to make the resulting conviction a denial of due process.") (internal quotation marks and modifications removed).

As discussed above, *see supra* Section I.C, there are important private and public interests that would be harmed by erroneous medical license revocations based on fraud. Accused physicians risk not only grievous harm to their property interest in their licensure, but also their liberty interest in their ability to earn a livelihood in medical and non-medical fields. The state has a similar interest in preventing erroneous revocations that would deprive the public of a qualified physician's medical services. With respect to evidentiary rules or review, the state does, of course, have countervailing interests in preventing dishonest physicians from harming the public, and in efficient adjudication of discipline charges. However, these interests are attenuated by the state's ability to prove its case under the lenient "preponderance" standard of proof, and by the relatively small number of fraud cases adjudicated each year.[13] The first and third *Mathews v. Eldridge* factors therefore favor the use of prospectively applied rules of evidence, or more searching review of evidentiary decisions already made.

The same conclusion arises from the second *Eldridge* factor – the risk of error. Fraud-based proceedings are particularly susceptible to error, for they turn critically on inferences of subjective fraudulent intent. Evidence that is improperly admitted at the outset may therefore have an outsized effect on a fact-finder's inferences, even if the proceeding as a whole seems fair. This is particularly true where, as here, the proceeding improperly allocates the risk of error evenly between a physician and the state by using a "preponderance of the evidence" standard of proof. In other words, because proof in fraud-based hearings rarely, if ever, includes direct evidence of intent, it is critical to the

---

[13] The Board for Professional Medical Conduct 2007 Annual Report, *available at* http://www.health.state.ny.us/professionals/doctors/conduct/annual_reports/2007/, states that of 303 final actions taken by the board, only 31 (roughly 10%) involved fraud.

accuracy of these hearings that inferences from each item of evidence be drawn properly. But this is nearly impossible to do if evidence is admitted that is irrelevant, unreliable, or prejudicial, even if the evidence as a whole might appear to be fair.

For all of the reasons above, the absence of evidentiary rules in medical discipline proceedings, and the deferential review of evidentiary decisions made during these proceedings, fail to meet the requirements of federal due process where a physician faces charges based primarily on fraud, and where the standard of proof is the minimal "preponderance of the evidence." Because these evidentiary principles are fundamental to every fraud-based medical discipline proceeding in New York, this procedural defect permeates all such proceedings. It is therefore susceptible to Plaintiff's facial challenge. This Court should therefore require that New York adopt either: 1) an intermediate standard of proof; or 2) rules of evidence ensuring that all evidence meets higher standards of relevance, reliability, and fairness, and more searching review of evidentiary decisions. These requirements would ensure that all physicians threatened with license revocation on charges of fraud receive the due process to which they are entitled.

## II.    Defendants' Revocation of Plaintiff's Medical License Violated Plaintiff's Federal Due Process Rights

Plaintiff's challenges to New York's standard of proof and Defendants' evidentiary rulings are even more compelling when considered in light of Plaintiff's particular circumstances. The Hearing Committee's use of the minimal and inadequate "preponderance" standard of proof resulted in an erroneous determination that Plaintiff harbored fraudulent intent. The high cost of this error was and is still being borne by Plaintiff, depriving him of interests in both property and his liberty, yet there was at no

47

point any threat to the health or welfare of the public. Indeed, Plaintiff was no longer

practicing medicine, and the only charges ultimately upheld in Plaintiff's case concerned

economic harm to an insurer. For these reasons, as-applied to Plaintiff's circumstances,

Defendants were required to utilize at least an intermediate standard of proof, and to

admit only evidence meeting ordinary standards of relevance and reliability. Their

failure to do so in the fraud-based disciplinary hearing here violated Plaintiff's federal

due process rights.

> *A.     The Hearing Committee's Lax Standard of Proof and*
> *Evidentiary Rules Deprived Plaintiff of a Fair Hearing To*
> *Rebut Defendants' Charges of Fraud*

Under *Mathews v. Eldridge*, Defendants failed to provide Plaintiff with

procedural protections sufficient to satisfy their federal due process obligations.

1. Defendants Permanently Deprived Plaintiff of Critical Property and Liberty

Interests

Plaintiff suffered harm to both property and liberty interests as a result of

Defendants' erroneous revocation of his medical license based on fraud. Defendants

concede that this license represents a property interest. *See* Def. Br. at 17. However, the

Second Circuit has also observed that such professional licenses also represent a liberty

interest.[14] *See RRI Realty Corp.*, 870 F.2d at 918 n.4; *Wilkerson*, 699 F.2d at 328.

Moreover, because Defendants sustained charges against Plaintiff based on fraud,

Defendants have also harmed Plaintiff's ability to pursue non-medical careers, including

his current legal practice. Plaintiff has endured the undeserved stigma of dishonesty, a

---

[14] Plaintiff's complaint characterizes a professional's interest in a medical license as
including, at minimum, a property interest. It also includes a liberty interest, as explained
in this memorandum, and the complaint makes no admission or concession in this regard.

false reputation that drives away business and other occupational opportunities. *See*
*Rombach*, 355 F.3d at 171; *Vess*, 317 F.3d at 1104.

Plaintiff's loss is in no way temporary. Defendants seem to suggest otherwise by
pointing to the possibility that they may grant a future application for reinstatement
pursuant to 8 NYCRR § 24.7(a)(2). Such reinstatement, of course, is a purely
discretionary matter and therefore does nothing to diminish the force of the initial,
erroneous revocation, or ameliorate the erroneous and extensive harm already inflicted on
Plaintiff's reputation and honest character. And though Defendants might have imposed
less permanent penalties, for purposes of Plaintiff's as-applied challenge, it matters only
that they did not.

### 2. The Risk of Error in Plaintiff's Hearing Was Unacceptably High

Medical discipline charges based on fraud are inherently error-prone, for they
require the fact-finder to infer subjective intent from circumstantial evidence. *See*
Section I.C.2, *supra*. Plaintiff's hearing was no exception. The minimal
"preponderance" standard permitted the Hearing Committee to make questionable and
tenuous inferences that Plaintiff harbored fraudulent intent – a finding unsupported by
any clear evidence. The absence of clear evidentiary rules compounded the risk of error,
principally by limiting Plaintiff's ability to corroborate his own testimony and that of his
key witnesses. These defects rendered Plaintiff's hearing fundamentally unfair.

An intermediate "clear and convincing" standard of proof protects the accused by
reducing the chance that the fact-finder will draw incorrect or inappropriate inferences
from the evidence before it, particularly as to an accused physician's subjective intent to
defraud. This is exactly what happened here. As the Appellate Division explained, there

was no direct evidence of fraudulent intent in this case. The Hearing Committee

therefore could only have inferred such intent from Plaintiff's "long-term relationship

with" the LaMed clinic, and from Plaintiff's lack of credibility. *See Matter of Tsirelman*,

876 N.Y.S.2d 237, 237 (3d Dep't 2009). In other words, the only evidence from which to

infer purposeful intent to defraud was: 1) the Committee's disbelief that Plaintiff held an

ownership stake for eleven months without being involved in medical coding decisions;

2) Plaintiff's later role as an attorney representing LaMed in arbitration; and 3) the

Committee's general disbelief of Plaintiff's testimony.

The Committee's inference of fraudulent intent from this evidence was tenuous, at

best, and unfortunately, also wrong. With respect to Plaintiff's brief ownership stint, the

Committee disregarded the direct and unequivocal testimony of Elana Rodriguez that

Plaintiff, like many physicians, simply had no role or expertise in translating his synaptic

treatment notes into medical billing codes. Similarly, the Committee failed to realize that

in defending LaMed's bills as an attorney, Plaintiff's defense reflected only the legal

position that LaMed hired Plaintiff to advocate; it had no bearing on Plaintiff's intent

when Flatlands prepared LaMed's bills in the first place. And while Plaintiff's

performance as a witness was admittedly subpar, what the Committee interpreted as

"evasion" or "contradictory" in his testimony was in fact merely the result of his

difficulty remembering minor operational details of a brief stint as a clinic owner, some

six or seven years removed from his current profession.

Finally, and perhaps most astoundingly, the Committee simply ignored the reality

that the medical codes in Plaintiff's bills were in fact accurate and proper at the time they

were assigned – that Plaintiff's bills communicated to insurers only that he had

performed synaptic therapy. In this vein, the Committee also did not consider that the use of two codes per procedure was not "double billing," but simply intended as the best way to fully describe the synaptic therapy in light of the code interpretation conventions at the time.[15]

For purposes of this action, of course, this Court need not evaluate the truth of Plaintiff's explanation. This explanation for the evidence that the Committee considered, however, illustrates why the preponderance standard sets the bar too low for ascertaining intent. It allowed the Committee to make a finding that Plaintiff harbored fraudulent intent without sufficient certainty or evidence to support this finding. An intermediate standard of proof would have impressed the Hearing Committee with the importance of its decision, and the need to avoid erroneous deprivation. It would have prevented an erroneous fraud finding absent clear, convincing, affirmative evidence of such fraud. And it would have properly allocated the cost of error between Plaintiff and the state. The Committee's failure to utilize this standard violated Plaintiff's due process rights.

In sum, the heightened risk of error inherent in Plaintiff's disciplinary hearing for fraud, coupled with the fact that Plaintiff bore the far greater share of harm stemming from an erroneous determination, required the use of an intermediate standard of proof and more accuracy-promoting evidentiary rules.

_____

[15] The Hearing Committee's misunderstanding of medical coding conventions demonstrates that its members were not, in fact, "uniquely qualified" to evaluate the fraud accusations in this case. Although two were required to be physicians, Plaintiff's hearing had little to do with the practice of medicine. Rather, the central issues revolved around the details of medical billing and coding. This is a completely separate field of specialization. Most doctors have little reason to be familiar with the details of medical coding, and for this reason generally entrust that process to professional coders.

51

### 3. New York's Interest in Protecting Citizens' Health and Welfare Would Have
### Been Unaffected by an Intermediate Standard of Proof or Evidentiary Principle

Defendants argue that their use of a "clear and convincing" standard of proof or would somehow prevent the state from "protecting the health and welfare of its citizens . . . through the regulation of professional licenses." *See* Def. Br. at 19-20. To the contrary, this interest would have remained essentially unaffected.

Plaintiff's disciplinary proceeding was essentially a simple insurance matter. Defendants began their investigation of Plaintiff at the behest of an insurer, and, as the Appellate Division determined, there was no evidence that Plaintiff provided inappropriate care to his patients. The only charges sustained against Plaintiff were based on the accusation that Plaintiff billed for services that he did not perform. *See Matter of Tsirelman*, 876 N.Y.S.2d at 237. As a billing dispute, this proceeding had no impact (or at worst, a highly attenuated impact) on New York citizens' health and welfare.

Defendants also fail to consider the cost of an erroneous fraud finding in this case on the health and welfare of New York citizens. If Defendants incorrectly revoked Plaintiff's license based on fraud, as Plaintiff asserts, then New York has been denied the services of an otherwise qualified physician. Even though Plaintiff has not practiced medicine regularly since 2001, he did continue to provide medical advice and assistance to friends and acquaintances until Defendants revoked his license. Moreover, Plaintiff's medical skills could still have been marshaled at some future date to promote the health and welfare of New Yorkers.

In contrast, neither New York nor the public would have suffered any significant loss had this proceeding been resolved in Plaintiff's favor – if Defendants were

convinced that Plaintiff actually posed a threat to the public's health and welfare, notwithstanding the fact that he was no longer practicing medicine, they would have been free to bring successive disciplinary proceedings against Plaintiff supported by appropriate evidence.

There is also no indication that the costs of complying with due process requirements would have created untenable burdens for Defendants. Defendants do not argue that it would have cost more or taken longer to prepare the disciplinary proceeding against Plaintiff under a higher standard of proof. There is no indication that Defendants would have – or could have – introduced any additional evidence to bolster their case against Plaintiff. A higher standard of proof would have affected only the Hearing Committee's analysis of the same evidence it reviewed in this case.

Similarly, the cost of obtaining and producing a complete set of medical records in this case would have been minimal. Defendants had already located and obtained a partial set of records. They were therefore already in a position to obtain the full records from the same custodian, and to properly certify these records.

### B. Plaintiff's As-Applied Due Process Challenges Are Not Barred by Collateral Estoppel or Res Judicata

Neither collateral estoppel nor res judicata bars Plaintiff's as-applied challenges. Res judicata does not apply because Plaintiff seeks relief that was unavailable in his Article 78 proceedings. Collateral estoppel, which Defendants assert only against Plaintiff's evidentiary challenge, is also inapplicable because Plaintiff does not challenge the same evidentiary rulings previously at issue. Plaintiff's due process argument does not concern the specific evidentiary rulings addressed by the Appellate Division, but

53

rather Defendants' more general failure to provide rules ensuring that all evidence satisfies basic rules of relevance, reliability, and fairness.

It is well-established that res judicata, or claim preclusion, "generally does not operate to bar a § 1983 suit following the resolution of an Article 78 proceeding, since the full measure of relief available in the former action is not available in the latter." *Colon v. Coughlin*, 58 F.3d 865, 870 n.3 (2d Cir. 1995) (citing *Davis v. Halpern*, 813 F.2d 37, 39 (2d Cir. 1987); *Davidson v. Capuano*, 792 F.2d 275, 278-82 (2d Cir. 1986)); *see also Hachamovitch*, 159 F.3d at 695 ("It is well settled that res judicata does not apply to bar a § 1983 action where a plaintiff has previously brought an Article 78 proceeding[; a plaintiff is] entitled to reserve his federal claim for the federal courts."). This is the case here. Plaintiff brings a range of claims and seeks relief that are unavailable in the far more limited Article 78 proceedings. In particular, Plaintiff in this case seeks damages of $100,000 related to Defendants' violations of Plaintiff's constitutional rights – with respect to both Plaintiff's standard-of-proof and evidence arguments.[16] Such damages are unavailable under Article 78, and Plaintiffs' claims in these regards are not barred. *See Davis*, 813 F.2d at 39.

Plaintiff's evidence-related claims are also not barred by collateral estoppel. As Defendants point out, Plaintiff's Article 78 petition was limited to arguing that Defendants erred by admitting uncertified and incomplete patient records, and expert testimony based on these records, for the Hearing Committee's consideration. As

---

[16] To the extent this Court determines the $100,000 sought by Plaintiff somehow does not constitute money damages, Plaintiff seeks permission to amend the complaint to add additional money damages that reflect the harm already suffered by Plaintiff as the result of Defendants' violation of Plaintiff's constitutional rights.

54

discussed above, however, Plaintiff's challenge in this § 1983 action is distinct. Plaintiff

does not challenge these two specific rulings as he did in the Article 78 proceeding.

Rather, he brings a facial challenge (which is wholly unavailable under Article 78) and an

as-applied challenge to the absence of evidentiary rules in medical discipline hearings

based on fraud, coupled with the lenient review standard that permits consideration in

such hearings of irrelevant, unreliable, and prejudicial evidence so long as the "entire

hearing" is not "infected" by a nebulous concept of unfairness. The Appellate Division

did not consider this challenge, nor did it even have the ability to do so with respect to

Plaintiff's facial challenge.

    For these reasons, this Court may consider Plaintiff's claims.

## III.    Federal Due Process Requires a Non-Discretionary Mechanism For Ensuring that Medical License Revocations Comply With Procedures In Effect While the Revocation Is Under Direct Review

    Despite Plaintiff's repeated efforts to obtain exculpatory evidence in Defendants'

possession, which Defendants are required to produce under New York Public Health

Law § 230(10)(d-1), Defendants have refused to provide it. The evidence Plaintiff seeks

includes medical bills and records from other synaptic therapy providers around 2000-01

that utilize the same set of codes to describe the therapy as the bills prepared by

Flatlands. It may also include documents from arbitrations or administrative proceedings

indicating that Flatlands' interpretation of billing codes they used for synaptic therapy

was shared by others. Such evidence would establish that Plaintiff's bills were, in fact,

correct and accurate based on the interpretation of medical codes at the time they were

prepared.

Defendants' stated reason for their refusal is that they lack any procedures for complying with law that comes into effect while New York state courts engage in direct review of medical disciplinary hearings. The absence of such procedures, made apparent in this case by Defendants' denials of Plaintiff's exculpatory evidence motions, violates federal due process both facially and as-applied to Plaintiff's proceeding.

> ### A.    Medical License Revocation Proceedings Must Provide a Mechanism for Ensuring Compliance With Procedural Rules In Effect While Under Direct Review

Contrary to Defendants' suggestion, Plaintiff does not argue that due process requires that administrative decisions be revisited "indefinitely" due to changes in governing law. Plaintiff's argument is merely that when there is a change to procedural rules that go to the fairness of an administrative proceeding – such as the one here requiring Defendants to produce exculpatory evidence – and when this change occurs while the proceeding is still under direct review, Defendants must provide some means for giving effect to the changed procedural rule, such as a reconsideration or reopening mechanism. Such a mechanism would have no impact on the State's interest in finality, for this review period would be unchanged. A *Mathews v. Eldridge* analysis therefore requires this mechanism in light of the significant private interests at stake and the reduced risk of erroneous license revocation.

Defendants' fear that a reconsideration mechanism would result in "no finality in any legal proceeding" and "stretch the notion of fairness" is overblown. Regardless of the State's interest in "ensuring the finality" of medical discipline decisions, this interest would be minimally impacted, if at all, were Defendants required to comply with fairness-oriented procedural rules that come into effect while the decision is under direct

review.[17] With or without such a mechanism, there would be no change to the time

period for review. The time period during which Defendants would be obliged to give

effect to procedural rules affecting the fairness of their proceedings is no different than

the period during which their proceedings currently remain under direct review by review

bodies or state courts. At all times during the lifecycle of a disciplinary proceeding, the

State would enjoy the same degree of finality that it already does now. The State's

interest in the finality of medical disciplinary decisions would be essentially unchanged.

Moreover, any additional cost of revisiting hearings still under review is of little

consequence, given that it is little different from costs already borne in New York when

the legislature or courts make changes to governing law. Indeed, Plaintiff's argument

would be consistent with existing procedures that govern most ordinary lawsuits in New

York. *See, e.g.*, *Daniels v. Millar Elevator Indus., Inc.*, 845 N.Y.S. 2d 785, 786 (2d

Dep't 2007) (noting that motions for leave to renew pursuant to CPLR § 2221 "based

upon a change in the law must be made before the time to appeal the final order has

expired"). It would also comport with the principle that "[g]enerally, a change of law

affecting a case which is on direct review must be given effect." *Morehouse v.

Volkswagen Aktiengesellschaft*, 427 N.Y.S. 2d 514, 515 (3d Dep't 1980). For these

reasons, under the first and third *Mathews v. Eldridge* factors, the greater property and

liberty interests of accused physicians weigh heavily in favor of requiring Defendants to

---

[17] For due process purposes, New York's Article 78 proceedings provide the function
most akin to direct review for medical disciplinary proceedings. *See, e.g.*, *Gross v. De
Buono*, 636 N.Y.S. 2d 147, 149 (3d Dep't 1996) (noting "direct review" of hearing
committee determination through Article 78 proceeding, pursuant to PHL § 230-c(5)).

comply with procedural protections that come into force while a physician is still pursuing his available avenues of direct review.

The second *Mathews v. Eldridge* factor similarly supports Plaintiff's argument. It is particularly imperative for Defendants to give full effect to procedural protections, like the exculpatory evidence disclosure requirement here, that are central to the fairness of disciplinary proceedings. In the criminal context, of course, it is well known that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Whether or not due process also requires the release of exculpatory evidence in medical discipline cases, *Brady* makes clear that such release is central to the fairness of such proceedings that affect a physician's property and liberty interests. When a state legislature makes this determination on its own, as New

mandate affects the underlying fairness of pending proceedings, due process requires that
it be applied to all proceedings still under direct review.

Defendants' contention that the availability of Article 78 proceedings satisfies due
process, *see* Def. Br. at 30, also misses the point of Plaintiff's claim. Defendants'
argument is essentially that, to the extent the Department of Health erred in denying
Plaintiff's motion for reconsideration and requests for exculpatory evidence, such error
could be remedied through an Article 78 proceeding to correct this error. But Article
78's availability is largely irrelevant in this case, for Plaintiff's argument is that
Defendants' refusal to apply statutory fairness-oriented procedures to proceedings like
Plaintiff's that are on direct review, coupled with the New York courts' apparent
acquiescence on this point, violate due process. In other words, Plaintiff does not
challenge the kind of "random, arbitrary act" for which Article 78 might serve as an
adequate post-deprivation remedy, *see Gudema v. Nassau County*, 163 F.3d 717, 724 (2d
Cir. 1998), but rather the apparent policy of Defendants. On this point, there is no
requirement that Plaintiff's exclusive avenue of relief for such constitutional violations be
through an Article 78 proceeding, where, as here, the original coercive action brought by
the state has already terminated. *See, e.g., Rodriguez v. Diaz*, No. 05-Civ-1831, 2009
WL 790035, at \*4 (S.D.N.Y. March 25, 2009) (denying motion to dismiss where state
court proceeding had been previously terminated, among other reasons).

Finally, the exculpatory evidence Plaintiff seeks would clearly be material to his
disciplinary hearing. This evidence establishes that the billing codes he utilized were, at
the time of the bills in question, commonly used to describe the synaptic therapy
procedure he did provide. And whether or not this practice was proper, it clearly

59

establishes that any error was purely the result of mistake or error, and that Plaintiff
lacked any intent to defraud.

## B. Younger Abstention Is Inapplicable

Plaintiff's claims do not satisfy the requirements for *Younger* abstention. First,
*Younger* abstention principles do not apply where, as here, a "litigant seeks money
damages for an alleged violation of §1983." *Rivers v. McLeod*, 252 F.3d 99, 102 (2d Cir.
2001) (citing *Kirschner v. Klemons*, 225 F.3d 227, 238 (2d Cir. 2000)). This is so
because when money damages are sought, "it is less likely that unacceptable interference
with the ongoing state proceeding, the evil against which *Younger* seeks to guard, would
result from the federal court's exercise of jurisdiction." *Kirschner*, 225 F.3d at 238.
Plaintiff seeks money damages of at least $100,000, *see* Compl. p.16, precluding *Younger*
abstention.

*Younger* abstention is also inappropriate because the original coercive
administrative action in this case terminated once the New York Court of Appeals denied
leave to appeal on October 22, 2009, and after the deadline expired for seeking a writ of
certiorari from the U.S. Supreme Court. Once Plaintiff exhausted these avenues of
appeal, there was no longer an "ongoing state proceeding" implicating "an important
state interest" – the first two *Younger* requirements. *See Liberty Mut. Ins. Co. v. Hurlbut*,
585 F.3d 639, 647 (2d Cir. 2009) ("The existence of ongoing state proceedings is an
essential requirement for *Younger* abstention: Absent any *pending* proceeding in state
tribunals, application by the lower courts of *Younger* abstention is clearly erroneous."
(internal quotation marks, ellipses, and brackets omitted)); *see also Dorsett-Felicelli, Inc.
v. County of Clinton*, 305 F. App'x 685, 686-87 (2d Cir. 2008) (summary order)

(concluding that *Younger* abstention does not govern case where original "state proceeding has long since terminated") (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005)). In any event, the Southern District has concluded that for *Younger* abstention purposes, Article 78 proceedings are not regarded as "appeals" requiring abstention. *See Meachem v. Wing*, 77 F. Supp. 2d 431, 442 (S.D.N.Y. 1999) (noting the absence of any case "holding that the availability of an Article 78 proceeding in state court should be tantamount to an unexhausted appeal for the purposes of *Huffman* [*v. Pursue, Ltd.*, 420 U.S. 592 (1975)] and *Younger*.").

## CONCLUSION

For the foregoing reasons, Defendants' motion to be dismiss should be denied.

Dated: Brooklyn, New York
     August 2, 2010

GARY TSIRELMAN[18]
65 Jay Street
Brooklyn, New York 11201

---

[18] Prepared with assistance from Clifford Chen of Watkins, Bradley & Chen LLP, 228
Park Avenue South #14905, New York, New York, an attorney licensed to practice law
in New York. Although proceeding *pro se* in this action, Plaintiff is himself licensed to
practice law in New York.