1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                        :
4    GARY TSIRELMAN,                    :
                                        :  10-CV-00903
5                   Plaintiff,          :
                                        :
6              v.                       :  225 Cadman Plaza East
                                        :  Brooklyn, New York
7    RICHARD F. DAINES, M.D., *et al.*, :
                                        :  September 15, 2010
8                   Defendants.         :
     ------------------------------------X
9

10         TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
              BEFORE THE HONORABLE JACK B. WEINSTEIN
11                 UNITED STATES SENIOR JUDGE

12

13   APPEARANCES:

14   For the Plaintiff:        CLIFFORD Y. CHEN, ESQ.
                               Watkins, Bradley & Chen LLP
15                             228 Park Avenue South
                               #14905
16                             New York, New York  10003

17   For the Defendants:       KATHRYN E. LEONE, ESQ.
                               Office of the New York
18                                Attorney General
                               120 Broadway
19                             New York, New YORK  10271

20
     Court Transcriber:        RUTH ANN HAGER
21                             TypeWrite Word Processing Service
                               211 N. Milton Road
22                             Saratoga Springs, New York  12866

23

24

25

     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service

2

```
1   (Proceedings began at 10:09 a.m.)

2           THE COURT:  Good morning, everybody.

3           MR. CHEN:  Good morning, Judge.

4           THE CLERK:  Civil cause for motion, Tsirelman v.

5   Daines, et al.

6           Counsel, make your appearances please.  For the

7   plaintiff.

8           MR. CHEN:  Clifford Chen.  My appearance.

9           THE COURT:  You're now appearing for the plaintiff?

10          MR. CHEN:  Yes, yes.  Along with --

11          THE COURT:  He's no longer pro se?

12          MR. CHEN:  He's not pro se, no.

13          THE COURT:  Okay.

14          MS. LEONE:  Kathryn Leone from the New York

15  Attorney's General on behalf of defendant.  This is our legal

16  intern.

17          MR. ANDRANOPOLIS:  Spiro Andranopolis [Ph.].

18          THE COURT:  And where are you going to school?

19          MR. ANDRANOPOLIS:  Cuny Law School.

20          THE COURT:  Cuny?

21          MR. ANDRANOPOLIS:  Cuny in Flushing.  On the campus

22  of Springs College.

23          THE COURT:  Oh, yes, yes.  Yes.

24          MR. ANDRANOPOLIS:  Yes, sir.

25          THE COURT:  Oh, Cuny [inaudible].
```

3

1            MR. ANDRANOPOLIS:  [Inaudible]

2            THE COURT:  All right.  I'll hear your motion.

3            MS. LEONE:  Thank you.  Petitioner is bringing the

4  civil rights -- plaintiff is --

5            THE COURT:  Keep your voice up.

6            MS. LEONE:  Plaintiff is bringing a civil rights

7  action alleging various due process violations.

8            THE COURT:  In front of you there's the

9  [unintelligible] up there.  Can you hear?

10           MS. LEONE:  He's alleging various due process

11  violations that he says occurred in his position disciplinary

12  proceeding.  There his license to practice medicine was

13  revoked.

14           THE COURT:  Excuse me.  Have you filed a notice of

15  appearance?

16           MR. CHEN:  Yes.

17           THE COURT:  I didn't have it.  When was that filed?

18           MR. CHEN:  It was yesterday.  Early afternoon.

19           THE COURT:  Okay.

20           MS. LEONE:  His license to practice medicine was

21  revoked after a finding of fraud.  He was found to have billed

22  insurance companies for services he did not provide.  He was

23  also fined $100,000.00.  He's now alleging due process

24  violations specifically that the standard of proof in those

25  proceedings must be higher than preponderance, that there

4

1   was -- that he -- that there's a lack of evidentiary rules,

2   and that there's a lack of a nondiscretionary mechanism to

3   open -- or to reopen a hearing and there's been a change in

4   the law. And so I'm just going to highlight some of our

5   points for each violation -- alleged violation beginning with

6   standard of proof.

7           He brings a facial challenge. The Legislature has

8   spoken here it is a preponderance of the evidence standard

9   that has been upheld in New York state courts and is actually

10  the predominant standard throughout the country in medical

11  disciplinary tribunals.

12          There's also Second Circuit law where upholding a

13  preponderance standard in attorney disciplinary actions, which

14  is the closest thing I could find to our case here, and

15  specifically plaintiff is challenging the standard of proof as

16  it relates to the fraud charge. He says it should be higher

17  specifically for fraud but there's really nothing about fraud

18  that compels a higher standard. We've seen the Supreme Court

19  when it has to assign a standard to a fraud statute, say,

20  securities fraud or civil RICO that they have assigned

21  preponderance of the evidence. And even though there is this

22  intent --

23          THE COURT: In court of what, the United States?

24          MS. LEONE: That's correct. And even though there's

25  an intent element of fraud that too does not necessarily

5

1   compel a higher standard.  In fact, we've seen when the

2   Supreme Court upheld the preponderance standard and then in

3   dealing with the ex-patriation statute that specifically

4   requires an intentional ex-patriation act and the reasoning

5   there was intensive heavy burden to begin with so we shouldn't

6   also elevate the standard of proof as well and that was

7   echoed --

8           THE COURT:  I'm not sure I'm following what you're

9   saying.

10          MS. LEONE:  Well, plaintiff's argument was that --

11          THE COURT:  Well, I understand plaintiff's argument

12  but in what cases has the Supreme Court of the United States

13  upheld the standard of preponderance in connection with

14  disbarment or with respect to medical revocation?

15          MS. LEONE:  I haven't found one, no.

16          THE COURT:  Let --

17          MS. LEONE:  I was just relating it to --

18          THE COURT:  Have you cited the Supreme Court cases?

19          MS. LEONE:  Yes.  In dealing with ex-patriation

20  statute, yes.  That's the Vance case.

21          THE COURT:  And that's a serious problem, you say,

22  for the person, ex-patriated.

23          MS. LEONE:  Yeah.  Right.  Well, they said it's --

24  the preponderance standard was sufficient because it's a

25  heavy -- the intentional -- proving intentional act is heavy

1  to begin with, a heavy burden, so they didn't feel the need to

2  then increase the standard of proof.

3           THE COURT:  Well, preponderance standard is more

4  probable than not.

5           MS. LEONE:  The preponderance standard is -- yes, I

6  think so, yes.  So even looking at the Matthews v. Eldridge

7  analysis --

8           THE COURT:  Do you have any other Supreme Court or

9  federal cases --

10          MS. LEONE:  I --

11          THE COURT:  -- applying the preponderance standard

12  to serious matters?

13          MS. LEONE:  I have the Herman and the Kleen v.

14  Huddleston case where the Supreme Court noted -- this was on

15  dealing with the securities -- securities fraud statute --

16  where the Supreme Court noted that a higher standard of proof

17  wasn't necessary even though you had to show a person's state

18  of mind.  Again, this intent element.

19          THE COURT:  What was the intent in?

20          MS. LEONE:  I believe it's the securities fraud.

21  intent.

22          THE COURT:  Fraud.

23          MS. LEONE:  Yeah.  Fraud.  It was securities fraud,

24  right.  And it was in a footnote at the very end of the case

25  where they note that.

7

```
 1              THE COURT:  And you cited that in your brief?

 2              THE COURT:  I did cite that.  I did cite --

 3              MS. LEONE:  Yes.

 4              THE COURT:  Do you have any Second Circuit cases

 5  like that?

 6              MS. LEONE:  I mean, the closest I found to this case

 7  was the attorney disciplinary cases or just one --

 8              THE COURT:  Second -- no.  The Court of Appeals for

 9  the Second Circuit.

10              MS. LEONE:  That's correct.

11              THE COURT:  You found one attorney discipline case.

12              MS. LEONE:  That's correct.  And the Eastern

13  District as well, the scope on that as well.

14              THE COURT:  Have you cited the Eastern District?

15              MS. LEONE:  I did.

16              THE COURT:  Yes.

17              MS. LEONE:  Yes.  So we went through a Matthews v.

18  Eldridge analysis as well and when you look at the substantial

19  interest of the State in protecting the public versus the

20  interests here, the medical license, which is at most property

21  interest, coupled with the already very low risk of error in

22  attorney -- in the physician disciplinary proceedings based on

23  the -- all of the procedures afforded in the Public Health Law

24  to the physician --

25              THE COURT:  I didn't follow that sentence.
```

1            MS. LEONE:  Sorry.  So there's a -- the physician

2  disciplinary proceedings already have a very low risk of

3  error.  The Public Health Law provides many protections to the

4  physician both --

5            THE COURT:  Like what?

6            MS. LEONE:  -- during and after.  They are entitled

7  to an attorney.  They're entitled to --

8            THE COURT:  He was entitled to one attorney at the

9  hearing?

10            MS. LEONE:  Yes.  He was entitled.  He had an

11  attorney.  Specifically in this case he had an attorney.

12            THE COURT:  At the hearing.

13            MS. LEONE:  At the hearing.  He produced witnesses,

14  evidence, he cross-examined witnesses for --

15            THE COURT:  And that's in the statute or --

16            MS. LEONE:  That's all in the statute.

17            THE COURT:  -- [unintelligible]?

18            MS. LEONE:  Public Health Law 230.  And so even

19  under Matthew v. Eldridge analysis it's still -- it comes out

20  as a preponderance standard that is -- that is adequate in

21  this case.

22            Petitioner also brings an as-applied standard.  As

23  applied --

24            THE COURT:  Are there any evidentiary rulings

25  embodied in the statute?  What rule -- what evidence?

1          MS. LEONE:  Public Health Law 230.10(f) says that

2    there are no rules -- that the hearing doesn't have to follow

3    set the Rules of Evidence, but that they have to show -- prove

4    their case by a preponderance of the evidence so there are no

5    set rules but, you know, the -- in order to comport with due

6    process the evidence has to be reliable and --

7          THE COURT:  Do you have any federal cases on that

8    issue?

9          MS. LEONE:  I do have a Southern District case

10   called Balqwena [Ph.] that says that there -- you don't have

11   to comport with due process.  I mean, you don't have to have

12   strict Rules of Evidence to comport with due process.

13         THE COURT:  In what kind of case?

14         MS. LEONE:  Balqwena was a -- that was a hearing

15   regarding taking children out of a foster care system.

16         THE COURT:  Oh.

17         MS. LEONE:  Foster care home.

18         THE COURT:  Well, that was a serious matter.

19         MS. LEONE:  Right.  And -- yes, so they -- and that

20   was a -- I believe that was substantial --

21         THE COURT:  Do you have any --

22         MS. LEONE:  -- evidence.

23         THE COURT:  Do you have any cases involving any of

24   the federal statutes with respect to benefits?

25         MS. LEONE:  There is a --

1          THE COURT:  Yes.

2          MS. LEONE:  There's the Richardson v. Peralis case,

3    I believe, that's dealing with Social Security benefits.

4          THE COURT:  And what standard?

5          MS. LEONE:  Well, the -- they also said that you

6    just have to have reliable evidence in an administrative

7    hearing.  Reliable and probative.

8          THE COURT:  Social Security benefits?

9          MS. LEONE:  Yes, I believe so.

10          THE COURT:  And did the federal Rules of Evidence

11    apply to the administrative hearing in the Social Security

12    cases?

13          MS. LEONE:  That I don't know.  I don't know.

14          THE COURT:  Well, we have reviews in connection with

15    the federal statute controlling retirement benefits and things

16    like that where the employer sets up a program for employees.

17    What evidence standards do they use there?

18          MS. LEONE:  I'm not familiar with the evidence

19    standard.  I'm sorry.

20          THE COURT:  I see.  Okay.  You have nothing on that.

21          MS. LEONE:  Basically what I have are the cases that

22    say reliable evidence is enough in administrative hearings.

23    That's the two cases that I cited for that.

24          THE COURT:  But there's no case that you found that

25    says that you have to follow the same script evidentiary

1  standards as a reply in federal or state courts.

2          MS. LEONE:  That's correct.  I did not find any case

3  like that.

4          THE COURT:  Okay.

5          MS. LEONE:  Petitioner --

6          THE COURT:  I assume there is no such case unless

7  the plaintiff can show me a case.  But you've looked for those

8  cases.

9          MS. LEONE:  I looked for those and what I found was

10  the Southern District case that said it's not a due process

11  violation simply because there aren't Rules of Evidence on --

12          THE COURT:  Okay.

13          MS. LEONE:  -- it.  Petitioner is also challenging

14  the burden of proof as applied to his case, as applied to his

15  disciplinary matter.  Petitioner brought an Article 78

16  proceeding following the physician disciplinary proceeding.

17  And he could have brought his challenge to the burden of proof

18  there as applied to his case.  It was the same parties.  It

19  was the same subject matter and he could have gotten the same

20  relief there that he's seeking here, so it really shouldn't be

21  re-litigated again here, so it's barred by -- our argument is

22  that it's barred by *res judicata*.

23          THE COURT:  Does the Court in Article 78 proceeding

24  have the right to say that the statute applied in the

25  proceeding being challenged was unconstitutional?

1        MS. LEONE:  I believe so.  In Article 78 I don't

2   believe he could facially attack it -- or I mean, he could but

3   he doesn't have to whereas he is taking --

4        THE COURT:  You haven't answered my question.  Does

5   the Court -- the state court in an Article 78 proceeding have

6   the power to declare an act relied upon which is being

7   challenged unconstitutional?

8        MS. LEONE:  Yes.  In an Article 78 you can make

9   Constitutional arguments --

10        THE COURT:  You have a case that says that?

11        MS. LEONE:  I do.  It's in my brief.  I'm not -- I

12   don't have it on the --

13        THE COURT:  Okay.

14        MS. LEONE:  -- tip of my tongue, but it is in my

15   brief where constitutional challenges can be made in Article

16   78 --

17        THE COURT:  Okay.

18        MS. LEONE:  -- proceedings, yes.

19        THE COURT:  Well, is it your argument that by

20   approving the administrative hearing in effect the Court was

21   claiming that the statute was constitutional?  Because if they

22   had decided it was unconstitutional it would have -- they

23   would have had to grant the petition.

24        MS. LEONE:  Well, he didn't make this argument.

25        THE COURT:  Whether he made it or not.  If something

13

1  was unconstitutional wouldn't the Court have the power and

2  wouldn't impliedly the issue be before the Court?

3          MS. LEONE:  The Court certainly could have made that

4  determination, yes.

5          THE COURT:  Well, isn't it normally before the

6  Court?  In an Article 78 proceeding, what is this?

7  Essentially mandamus?

8          MS. LEONE:  Yes.  Mandamus and -- yeah.  That's

9  correct.

10          THE COURT:  Somebody is doing something that's

11  unconstitutional wouldn't you be entitled to mandamus under

12  traditional common law?

13          MS. LEONE:  He certainly could have brought those

14  constitutional --

15          THE COURT:  Wouldn't that necessarily be an issue

16  for the Court?  If somebody came before you with somebody --

17  with something that was unconstitutional wouldn't they be

18  entitled to mandamus and Article 78 relief?

19          MS. LEONE:  Yes.

20          THE COURT:  Well, can't we assume that the Appellate

21  Division knew what the Constitution required?

22          MS. LEONE:  Yes.

23          THE COURT:  Have you got cases where the Appellate

24  Division in an Article 78 proceeding declared that the

25  petition had to be granted because something unconstitutional

14

1    was being done in the way of interpreting or applying a

2    statute?

3              MS. LEONE:  I didn't -- I did not cite any case to

4    that, I don't believe, where the Appellate Division found

5    constitutional -- a constitutional deprivation.  I can

6    research it.

7              THE COURT:  Well, give me a letter on that.

8              MS. LEONE:  Okay.

9              THE COURT:  But in any event, your contention is he

10   could have made the argument.

11             MS. LEONE:  Sure, yes.

12             THE COURT:  Do you have cases on that that you can

13   argue that it is an unconstitutional statute?

14             MS. LEONE:  Well, he can argue that certainly that

15   it was unconstitutional as applied to his case so that there

16   were due process violations that occurred during that hearing.

17             THE COURT:  Or facially.

18             MS. LEONE:  Article 78, no, he can't -- he -- I

19   guess maybe he could.  He just doesn't have to bring an

20   Article 78.  I can't argue *res judicata* for that -- for a

21   facial challenge.

22             THE COURT:  Well, you haven't answered my question.

23   Do they have the power to declare the petition has to be

24   granted because the statute relied upon in the administrative

25   hearing was unconstitutional on its face?

15

1          MS. LEONE:  I think they have the power to do that.

2          THE COURT:  Do you have a case?

3          MS. LEONE:  No, I did not cite a case for that.

4          THE COURT:  Well, would you look for a case and give

5    me the letter?

6          MS. LEONE:  Yes, I will.  Yes, I will.

7          THE COURT:  Now, what is the state law with

8    respect -- are you claiming *res judicata* or collateral

9    estoppel?

10          MS. LEONE:  *Res judicata* for the as-applied

11   challenges.

12          THE COURT:  If they had the power to declare it

13   unconstitutional and if by failing to do so -- I'm just asking

14   because I'm not saying this is the argument -- they impliedly

15   found that it was a constitutional statute requirement on its

16   face.  And if a party doesn't raise that issue what is the New

17   York state law with respect to *res judicata* or the federal --

18   the federal law, as I understand it, is that you have to bring

19   up all these points or otherwise you've waived it, right?

20          MS. LEONE:  That's what I've found, too, for *res*

21   *judicata* in New York that they -- New York follows this

22   transactional approach so you have to look at the subject

23   matter that's before the Appellate Division and --

24          THE COURT:  Under New York *res judicata* if he could

25   have argued unconstitutionality but did not in any respect as

1   he waived that argument in a subsequent action.

2           MS. LEONE:  Yes.  My argument is that, yes, that

3   it's barred.

4           THE COURT:  And you have cases that say that is the

5   interpretation of *res judicata* in New York?

6           MS. LEONE:  I'm not sure what cases I've cited for

7   that.

8           THE COURT:  Well, I'd like you to give me a

9   letter --

10          MS. LEONE:  Okay.

11          THE COURT:  -- supplementing your brief.  I think

12  it's New York law *res judicata* that applies.  Is that right?

13          MS. LEONE:  That's correct.  Yes.

14          THE COURT:  I think the *res judicata* on the federal

15  law would incorporate arguments that you might have made but

16  did not make.  Is that right?

17          MS. LEONE:  Exactly.  Exactly, yes.

18          THE COURT:  Is that the restatement of judgment?

19  Have you dealt with this problem?

20          MS. LEONE:  Yes.  I mean, I've cited numerous cases

21  for this argument.

22          THE COURT:  But if you don't raise the argument

23  it's -- you can't raise it in the subsequent proceeding?

24          MS. LEONE:  Correct, correct.  I have the --

25          THE COURT:  And that includes unconstitutionality on

17

1  its face?

2      MS. LEONE:  That I don't know.  I don't know.

3      THE COURT:  Well --

4      MS. LEONE:  Okay.

5      THE COURT:  -- would you supplement your brief?

6      MS. LEONE:  Sure.

7      THE COURT:  Your brief is very god but I'm concerned

8  about this issue.

9      MS. LEONE:  Okay.

10     THE COURT:  Get me the red book, please, the CPRLs.

11 It's on the bench or in a drawer there.

12     An Article 78 proceeding is an action under the

13 CPLR, is it not?

14     MS. LEONE:  It is.  It's Section 78.

15     THE COURT:  And the Appellate Decision is a division

16 of the Supreme Court and acting here as a *nisi prius* court has

17 the power of the Supreme Court acting as a trial court,

18 correct?

19     MS. LEONE:  Exactly.  And it's by statute that it

20 goes straight to the Appellate Division as opposed to --

21     THE COURT:  But it's -- when you go to the Appellate

22 Division it's the equivalent of going to the *nisi prius* court

23 in a proceeding.  Section 103 of the New York CPLR, (a)

24 there's only one form of civil action; (b) "All seated

25 judicial proceedings shall be prosecuted in the form of an

1    action except where otherwise prescribed by law procedure in

2    special proceedings shall be the same as in an action."

3    Doesn't the Appellate Division approach these cases by asking

4    what any trial court would have -- or have jurisdiction are

5    the parties properly before me is there a cause of action and

6    has the defendant attempted to apply an unconstitutional

7    statute or has it attempted to apply a constitutional statute

8    in an unconstitutional way.  Isn't that what it has to do

9    under 103?

10             MS. LEONE:  Yes, I believe so.

11             THE COURT:  I'm just trying to -- I mean, you know

12   more about the practice.  I'm just the federal judge.  But

13   it's -- and I've already diverted I guess to 7803 -- 7803,

14   which is the Article 78 provision.

15             "Questions which may be raised in such proceeding

16   include (2) whether the body or officer proceeded or is

17   proceeding or is about to proceed without or in excess of

18   jurisdiction; (3) whether a determination was made in

19   violation of the lawful procedure."

20             It uses the word "lawful procedure."  Doesn't that

21   include constitutionality?

22             MS. LEONE:  Yes.

23             THE COURT:  The federal practice has some situations

24   in which you have to go to the intermediate court as well.

25   Immigration cases.  How does it deal with immigration cases?

1   The Court of Appeals for the Second Circuit what is its power

2   [ph.]?  It's essentially the same kind of review, isn't it?

3   Would you look at those cases and see what it's about and

4   analogize it and [unintelligible] brief.  It's an interesting

5   problem.

6            MS. LEONE:  Um-hum.

7            THE COURT:  As I say, I don't know much about the

8   State practice in an Article 78.  I guess historically a

9   combination of the old rich in one simplified practice.

10           MS. LEONE:  So the final due process violation

11  allegation is this lack of a non-discretionary mechanism in

12  the Public Health Law that would allow a hearing to be

13  reopened when there's been a change in the law.  That's the

14  third claim.

15           THE COURT:  And the change in the law here was?

16           MS. LEONE:  The change in the law was in November

17  2008 Public Health Law --

18           THE COURT:  After the hearing or before?

19           MS. LEONE:  After.  It was amended -- the law was

20  amended to mandate that OPMC turn over exculpatory evidence

21  when in the past it was not mandatory.

22           THE COURT:  What did this new amendment say?  Say it

23  again slowly.

24           MS. LEONE:  That OPMC -- I don't have the exact

25  words but that OPMC had to turn over exculpatory evidence to

20

1  the physician.

2          THE COURT:  And what is the exculpatory evidence

3  that it's alleged they failed to turn over?

4          MS. LEONE:  I believe what they say there is is

5  evidence of other attorney -- other physicians billing the

6  same way that he billed.

7          THE COURT:  Well, what is the rule of law with

8  respect to the application of changes in the law subsequent to

9  the ruling in New York?

10          MS. LEONE:  In New York.  I don't believe that there

11  are retroactive if that's what you're asking.

12          THE COURT:  Was the Article 78 proceeding brought

13  before the amendment?

14          MS. LEONE:  The Article 78 proceeding was brought,

15  yes, before the amendment and the decision in the Article --

16          THE COURT:  Well, generally the rule, as I

17  understand it, in the federal court is if the law is changed

18  during the appeal they apply the new law and remand it.  What

19  is the situation in the state court?

20          MS. LEONE:  I believe -- you know, I'm not sure.

21  I'm not sure at all.

22          THE COURT:  Are you arguing that the new law doesn't

23  apply here?

24          MS. LEONE:  Well, I'm arguing that --

25          THE COURT:  You are, yes.  But you're arguing that

21

1   even if it does apply, what?

2           MS. LEONE:  Even if it applies it wouldn't change

3   the fairness of the hearing.

4           THE COURT:  Why not?

5           MS. LEONE:  Because there was a -- the basis for the

6   fraud finding was based on his own admission of the

7   misconduct.  The bills that were not disputed as unreliable

8   and the credibility determination about his excuses for the

9   billing were just not credible.  So any exculpatory evidence

10  and other physicians reviewing it will -- first of all, that

11  doesn't mean that it's not misconduct but --

12          THE COURT:  Did you in your brief consider the

13  general rule in the federal courts -- I believe it's also true

14  in the state -- that it's no defense that others were not

15  prosecuted?

16          MS. LEONE:  I didn't consider that.

17          THE COURT:  In your briefing?  That is to say the

18  prosecutor has the discretion to ignore others and prosecute

19  selectively.  Second Circuit has ruled repeatedly on that.

20          MS. LEONE:  There is --

21          THE COURT:  What is the law of New York as well as

22  [unintelligible].

23          MS. LEONE:  Can I just say one other thing?

24          THE COURT:  Yes.

25          MS. LEONE:  The Public Health Law does have a

22

1  provision that's ten -- that's 230.10(q) that allows a

2  physician to petition to have his or her hearing reopened and

3  that petition goes to the director of OMPC.

4          THE COURT:  Is there a time line?

5          MS. LEONE:  No.

6          THE COURT:  Was there such a petition?

7          MS. LEONE:  No.

8          THE COURT:  He did not exhaust that remedy?

9          MS. LEONE:  No, he did not and he was informed of it

10  and he did not exhaust it.

11          THE COURT:  How was he informed?

12          MS. LEONE:  By email.  In fact, the email is

13  attached to, I believe, they're in my affidavit or the other

14  affidavit submitted.

15          THE COURT:  And your contention is he hasn't

16  exhausted his administrative remedy?

17          MS. LEONE:  That's my argument that he could have

18  gone this route and he didn't.  And had the petition been

19  denied he then could have brought an Article 78 on that.

20          THE COURT:  Anything else?

21          MS. LEONE:  That's it.  Thank you.

22          MR. CHEN:  I guess I'll respond to the points in

23  turn, but --

24          THE COURT:  Well, I have some question I want to ask

25  you --

1           MR. CHEN:  Okay.

2           THE COURT:  -- on the facts before you get into the

3    law.  You concede that the plaintiff billed under the wrong

4    code.

5           MR. CHEN:  I don't think he billed -- as I

6    understand it I don't believe he -- well, the bills.  There's

7    a question -- I mean, there was a question of fact whether he

8    was actually involved with the billing at all having

9    outsourced that, but --

10          THE COURT:  Did he -- did bills going out -- bills

11   go out under his name --

12          MR. CHEN:  Sure.

13          THE COURT:  -- for which he was to be compensated

14   under the wrong classification.

15          MR. CHEN:  I don't think that the codes themselves

16   were necessarily wrong at the time that they're prepared.

17   They're -- the procedure he performed, the synaptic therapy --

18          THE COURT:  What was the procedure he performed?

19          MR. CHEN:  As I understand it's a non-evasive pain

20   management procedure that basically applies an electrical

21   current to specific nerve areas.

22          THE COURT:  And what is the procedure he billed

23   under?

24          MR. CHEN:  Well, he -- the intent was just to bill

25   for that procedure described with for --

24

1        THE COURT:  What is the description of the procedure

2 that he billed under?

3        MR. CHEN:  Well, the labels for the codes are one

4 code -- well, what are combined at two codes.  One code used

5 various terms that described, as I understand it, part of the

6 theory involving locating the electrodes in the proper place

7 and prepping the machine.  As I understand, the second code

8 was meant to describe the actual performance of the therapy

9 monitoring machine and such.

10        THE COURT:  Well, that's the one he billed under,

11 the second code, isn't it?

12        MR. CHEN:  Well, he billed -- he billed under both

13 codes because I believe that the understanding at the time was

14 that those two codes -- because there wasn't any --

15        THE COURT:  Forget about the understanding.  Under

16 what code was he billing?

17        MR. CHEN:  Well, there wasn't -- the problem is

18 there was a single code that described exactly this therapy.

19        THE COURT:  Is there a code that determines how much

20 will be paid for a procedure?

21        MR. CHEN:  Well, the -- each code, as I understand,

22 is -- describes some -- can describe a range of procedures for

23 which there is a set payment that insurers come into agreement

24 with.

25        THE COURT:  Is there a code number for a procedure

25

1    that determines what the compensation is for the work done?

2            MR. CHEN:  For this particular procedure there

3    wasn't a single code is my understanding.

4            THE COURT:  What is the code that he billed under?

5            MR. CHEN:  Oh, he billed under two codes, I believe,

6    and that's where the misunderstanding the problem arose from.

7    One code was 64550, which as I under --

8            THE COURT:  In fact, read -- read the --

9            MR. CHEN:  It reads, "Application of surface neuro

10   stimulator transcutaneous."

11           THE COURT:  Okay.

12           MR. CHEN:  And this -- and to describe the therapy

13   he performed this -- in full because that didn't -- because

14   that didn't describe the full procedure.  He also billed just

15   depending on the location of the electrode either 64613 or

16   64622.

17           THE COURT:  What do they read?

18           MR. CHEN:  And those are described in the text and

19   this is from a standard -- these are from -- these come from

20   standard text.  Each code is linked to a standard description

21   in these books is my understanding of this industry.  But the

22   label for 64613 is destruction by neurolytic agent -- I may

23   not be pronouncing these right -- but "Chemo denervation of

24   muscle end plate and cervical spinal muscle" and that was for

25   one location and a different -- and if it was in a different

26

1  place it would have been described as "distraction by a

2  neurolytic agent, para-vertebral facet joint nerve lumbar

3  single level."

4          THE COURT:  Give the code, please.

5          MR. CHEN:  Sure.

6          THE COURT:  Did he bill under -- this is -- I'm

7  looking at --

8          MR. CHEN:  I believe this is -- this was redacted

9  evidence that was presented at the hearing of the bills that

10  were submitted -- or the bills that were placed in dispute.

11          THE COURT:  I'm looking at a page marked Court

12  Exhibit 1.  It has 2005 at the top, I guess.  That's --

13          MR. CHEN:  Oh, the doc number and page there is

14  referred to here.  It might be useful.

15          THE COURT:  Document 17-1.

16          MR. CHEN:  Page 2.

17          THE COURT:  Page 2.  All right.  Court Exhibit 1

18  it's called [ph.].

19                  [Pause in the proceedings.]

20          THE COURT:  Well, what was he billing under, all of

21  these codes?

22          MR. CHEN:  Well, these -- as I understand it these

23  describe -- these describe treatments over a number of

24  sessions and so in this case --

25          THE COURT:  This is for a particular patient?

1          MR. CHEN:  For a particular patient, yes.

2          THE COURT:  And he was giving all of these

3     treatments?

4          MR. CHEN:  Well, I think it's worth noting that

5     this -- these medical records in the back were also attached

6     to this bill --

7          THE COURT:  All right.  They're all --

8          MR. CHEN:  -- to try to clarify what was going on.

9          THE COURT:  On the second part of it at pages 3 of 5

10    and 4 of 5.

11         MR. CHEN:  Right.  And what it shows, as I

12    understand, is on these various dates he performed synaptic

13    therapy once in the -- on the -- in the shoulder or upper

14    region, once in the lower back region.  And so for each upper

15    back region or shoulder region there is a code for the 64550

16    to describe the prep.

17         THE COURT:  Well, he did -- he charged 7329 twice.

18         MR. CHEN:  No.  Well, yes.  But once for each

19    application.  Each application --

20         THE COURT:  One --

21         MR. CHEN:  -- one in the shoulder area and one in

22    the lumbar region area.

23         THE COURT:  Well, what else did he charge for?

24         MR. CHEN:  So each of these codes correspond with a

25    second billing code specific to the region that describes

28

1  the -- or at least again as I understand it described another

2  part of the procedure monitoring the patient, making sure that

3  the electric currents were being applied properly and such.

4              THE COURT:  Well, this says $335.00, the third item.

5              MR. CHEN:  Right.

6              THE COURT:  It's all on the same day -- this -- on

7  the same day.

8              MR. CHEN:  Right.  And so what this describes is

9  that on this --

10             THE COURT:  On the same treatment -- oh, excuse me.

11  3/29/2001.  That's one patient, correct?

12             MR. CHEN:  Yes.

13             THE COURT:  He charged 7329, 7329, 35501 and 28172.

14  Correct?

15             MR. CHEN:  Yes.  So the total charge for one of the

16  synaptic therapy applications on, say, the upper back would

17  have been the combination of the 64550 plus depending on the

18  region either of these other two billing codes.

19             THE COURT:  Well, he charged for both of them,

20  six -- he charged for 64550 twice.

21             MR. CHEN:  Um-hum.

22             THE COURT:  64613 once and 64622 once.

23             MR. CHEN:  Right.

24             THE COURT:  Then on 3/30/2001, the next day, he

25  charged again two times 7329, one time 355.01, one time 28172,

1  and then --

2          MR. CHEN:  Right.  That's a third date.

3          THE COURT:  Third date which is next month.  It's

4  7325, 7329 -- 7329, 7329, and 35501.  And 28172 for a total

5  charge of $2,349.33, correct?

6          MR. CHEN:  Yes.

7          THE COURT:  How many times did he put these -- what

8  did he do, put electrodes on a person?

9          MR. CHEN:  Well, I believe -- again, this is my

10  understanding of the procedure is that, yeah, there's a

11  machine that issues a wave form of electric pulses.  He has to

12  locate -- each time when he performs a procedure he has to

13  prep the electrodes, find the correct location for the nerves

14  on the patient when they come in, and then after they're

15  prepped and placed then be present while the machine is

16  running or be available while the machine is running to

17  monitor that it's going properly and then documenting the

18  procedure and doing follow-up work.

19          THE COURT:  Let's get the facts.  What -- why was

20  this improper?

21          MS. LEONE:  Because he was billing for these nerve

22  destruction procedures, MVPs that he performed -- admittedly

23  never performed.

24          THE COURT:  Which one?  Which ones?

25          MS. LEONE:  I --

30

1            THE COURT:  $355.01?

2            MS. LEONE:  They are called --

3            THE COURT:  Destruction by neuro --

4            MS. LEONE:  Exactly.

5            THE COURT:  -- neurolytic agent?

6            MS. LEONE:  Yes.

7            THE COURT:  For which he was charging 355 already.

8    He did not perform those?

9            MS. LEONE:  He admittedly did not perform the

10   destruction procedures.  What he claims to have performed I

11   believe were the synaptic procedures which is billed as the

12   application of surface nerve stimulator.

13           THE COURT:  Now, are you contesting that?  Did he

14   give this service on 3/30/01 -- 2001 destruction by neurolytic

15   agent?

16           MR. CHEN:  Yes.

17           THE COURT:  $355.01.

18           MR. CHEN:  Right.  Well, yes.  The admission --

19           THE COURT:  Did he give this service?

20           MR. CHEN:  He gave a service that is described by

21   that billing code, yes.  And where the confusion arise -- and

22   the argument that I think plaintiff had tried to make during a

23   hearing was that -- was that what the hearing committee

24   interpreted this billing code as being -- as described

25   exclusively is this sort of invasive permanent destruction of

31

1    nerves which the plaintiff has admitted all along was never

2    performed because that would be improper under the

3    circumstances.

4              But the argument that was made and the reality of

5    the situation was that because there wasn't a single billing

6    code to describe what he was performing, the billing company

7    that -- the coders that specialize in this work picked two

8    codes that even though they weren't -- even -- neither of the

9    two was an exact fit for exactly what happened.  The two were

10   the best codes that they could find that described what was

11   actually performed.

12             And, again, to avoid confusion I think it's

13   important to note that these medical records were attached to

14   the bills just to try to clarify exactly what happened so if

15   there's going to be confusion that these permanent invasive

16   procedures were performed that -- and again, as everyone

17   agrees there's never any doubt that the plaintiff ever

18   performed these destructive permanent procedures.

19             THE COURT:  He did not.

20             MR. CHEN:  He did not.

21             THE COURT:  But he charged for them.

22             MR. CHEN:  No.  He did not.  He -- this bill -- the

23   argument is that the -- see, these billing codes can

24   describe -- at least as understood at the time and apparently

25   by the billing company these billing codes can describe a

1    range of different types of procedures.  And I believe -- and

2    my understanding is that the billing company even though the

3    textual description here wasn't an exact match for what was

4    done, it was given the range of codes that were available the

5    best code for describing the procedure performed that they had

6    available to them.

7              THE COURT:  But it was -- he did not prescribe -- do

8    this procedure described as Court Exhibit Number 1

9    "Destruction by neurolytic agent ran [ph.], camo-denervation

10   of muscle end plate, cervical spinal muscle, e.g., for

11   spasmodic torticolis."

12             MR. CHEN:  He didn't perform a permanent invasive

13   version of that procedure and he didn't use chemicals.  That's

14   true.  But --

15             THE COURT:  Well, then he didn't do it.

16             MR. CHEN:  Well, it's not -- well, I'd note that the

17   description isn't -- doesn't indicate that it's a permanent

18   procedure and looking at some of the other medical texts or

19   some of the other coding discussions at the time, I think goes

20   when viewed by some -- when you say "destruction" it was

21   destruction of the nerve function on a temporary basis and

22   that the code could encompass that as well.

23             THE COURT:  All right.  Go on with your argument.

24             MR. CHEN:  Just -- right.  So, I mean, just to close

25   on this topic, you know, the code here it regards a permanent

1  procedure; doesn't describe what was actually performed.  But

2  I think the broader point is that there was no code that he

3  could have picked that did describe what he performed.

4        THE COURT:  I understand your position, but he did

5  not do what is described here quite specifically.

6        MR. CHEN:  But he --

7        THE COURT:  He did something near it.

8        MR. CHEN:  Right, but I think it's also common --

9  it's common practice for the billing community to describe a

10  procedure that did not have a specific code assigned to it

11  with these best fit codes.

12        THE COURT:  Well --

13        MR. CHEN:  And --

14        THE COURT:  -- that's another problem.  That's a

15  question of whether the community should have been prosecuted.

16  That's a select prosecution issue.

17        MR. CHEN:  I'm not sure it's selective prosecution

18  issue if it was the common understanding among people that

19  performed that --

20        THE COURT:  Did he notice it was a common

21  understanding?

22        MR. CHEN:  I don't -- I don't know personally.

23        THE COURT:  Well, he must have if he did --

24        MR. CHEN:  I don't know that.

25        THE COURT:  -- it and --

34

1          MR. CHEN:  Well, I'm not --

2          THE COURT:  -- justifying it.  Why did he do it if

3    he knew that it was not a description unless he was also under

4    the impression that this was the appropriate way other people

5    were doing it?

6          MR. CHEN:  Well, again, you know, we're going

7    against the facts that were found, I understand, but he wasn't

8    involved in picking these codes in the first place.  This

9    was --

10          THE COURT:  But he's responsible.

11          MR. CHEN:  He's responsible but I think being

12    responsible for codes in terms of what's billed is different

13    than having the intent to defraud someone based on what the

14    choice is made by an outsource billing firm.  And, you know, I

15    think --

16          THE COURT:  It can be billed differently.  Did he

17    sign them?

18          MR. CHEN:  Again, it seems that a lot of these were

19    done with the signature stamp on those that the management

20    company had.

21          THE COURT:  Well, this Court Exhibit 1 looks like a

22    signature.

23          MR. CHEN:  It does and based on the testimony that I

24    looked at from the hearing, my understanding is that the

25    billing company used a signature stamp basically to process

1  these bills without his direct involvement.

2          THE COURT:  Well, if he gave them a signature stamp

3  then he was, in effect, authorizing them to sign his name.

4          MR. CHEN:  Sure.  And that may have been a mistake

5  but, again, I mean, I think what we're dealing with is whether

6  or not he had the fraudulent intent to submit these bills

7  when all he was doing, as I understand it, was telling the

8  billing company what he was performing, providing the medical

9  records which were attached to these bills describing exactly

10  what happened and leaving it to the coders which is a fairly

11  specialized task that doctors, as I understand, don't

12  typically get their hand -- get involved with because it's

13  complicated and involves a lot of interaction with the

14  insurers exactly how to translate medical records that he

15  produced and gave to the billing company and to codes that

16  were understandable and to process by the insurers.

17          Now, you know, obviously these are all factual

18  findings from the hearing committee that aren't, you know, so

19  much directly at issue for a lot of legal arguments we're

20  making here, but I think they do underscore the fact that had

21  there been a standard of proof equal -- sufficient to meet

22  the --

23          THE COURT:  I don't see how the standard of proof

24  have any effect here whatsoever based on your argument.  What

25  standard of proof do you say should have been applied?

36

1          MR. CHEN:  Well, it's applied in a number of states

2   and what several state Supreme Courts have held requires as a

3   matter of constitutional law is a clear and convincing

4   standard, rather than a preponderance.

5          THE COURT:  There are three general standards:

6   preponderance, more probable than not, beyond a reasonable

7   doubt, very highly probable in the 90 percent probability

8   involved, and clear and convincing somewhere in between

9   roughly about 70 to 80 percent probability.  Correct?

10         MR. CHEN:  Yes.

11         THE COURT:  But even if they applied the same set --

12  or the same test you're now proposing they would have reached

13  the same conclusion.

14         MR. CHEN:  Oh, I'm not too sure that's the case.

15  There's no discussion certainly in the hearing -- in the

16  determination and order and the hearing that had they applied

17  a clear and convincing standard they would have reached the

18  same conclusion.  It's difficult for us to say at this point

19  what that hearing committee would have done.  And there are

20  cases where challenges similar to this have been denied where

21  the hearing committee did state that under any standard of

22  proof they would have come to the same conclusion, but that

23  wasn't the case here.

24         THE COURT:  Some states require clear and

25  convincing.  None of them require beyond a reasonable doubt.

1         MR. CHEN:  I haven't come across any required beyond

2    reasonable doubt in these circumstances.

3         THE COURT:  But most of them apply a preponderance.

4    Isn't that so?

5         MR. CHEN:  Through medical pro -- disciplinary

6    proceedings in general but I think -- and there are fewer

7    cases directly on point where we're dealing with a medical

8    disciplinary proceeding that's predicated on charges of fraud.

9    I think that there'd be more agreement -- perhaps a majority,

10   probably a majority if -- a substantial majority even of

11   states that would say that whether as a matter of policy or as

12   a matter of due process that the higher standard should

13   supply.

14        THE COURT:  Have you made such a survey?

15        MR. CHEN:  I --

16        THE COURT:  Is there a survey of the state showing

17   that that is the preponderance standard?

18        MR. CHEN:  I've -- in our brief we did list the

19   cases of states that have addressed or at least alluded to or

20   discussed in some fashion professional disciplinary

21   proceedings predicated on fraud charges.  And there seems to

22   be a view that those -- that given the heightened harm caused

23   by fraud charges in conjunction with the interest at stake in

24   professional licensing that the clear and convincing standard

25   is favored over a preponderance standard.

1              THE COURT:  By more states?

2              MR. CHEN:  Well, there's -- again, because that's

3     the specific challenge that we're bringing here hasn't been

4     directly addressed by some of these states it's difficult to

5     say exactly.  A survey is difficult to do because there just

6     haven't been opinions in that regard.  But, again, what I've

7     tried to -- what we've tried to establish is that certainly

8     with medical disciplinary proceedings in general some

9     states -- perhaps a minority, but it's an accepted view as a

10    matter of due process -- require clear and convincing

11    evidence.  And given that a number -- a majority of states

12    require heightened standard of proof in fraud cases in general

13    whether -- again, whether as a matter of policy or due process

14    that suggests that more than a minority, perhaps a majority,

15    perhaps a clear majority would, again, as a matter of policy

16    or due process require heightened -- as heightened standard of

17    proof in professional disciplinary proceedings predicated on

18    fraud.

19             THE COURT:  You haven't made a -- polled a survey to

20    show that at least you can say that there is a split in the

21    states with respect to the issue of the standard.

22             MR. CHEN:  Well, but I think with respect to

23    professional discipline based on fraud, again, there's no --

24    it's hard -- there's -- I think there's a much heavier

25    consensus -- a much more apparent consensus --

1          THE COURT:  But there is a split.

2          MR. CHEN:  Sure.  There are states that provide --

3          THE COURT:  For both ways.

4          MR. CHEN:  There are some states that --

5          THE COURT:  Some say preponderance and some clear

6  and convincing.

7          MR. CHEN:  True, but that's alls -- that's been the

8  case in -- as I believe almost all of the cases in which the

9  Supreme Court -- the U.S. Supreme Court has required a

10  heightened standard of proof across all states.  There have

11  been some states and actually that's how the challenge gets to

12  that court in the first place.  There have been some states

13  that use a preponderance and some that use clear and

14  convincing.  And as a matter of constitutional due process

15  looking at the merits -- looking at the splitting the states

16  [ph.] as perhaps one factor, but both looking primarily to the

17  merits of the Matthews analysis or other due process analysis

18  just as a matter of constitutional due process the Supreme

19  Court has found a higher standard of proof necessary even in

20  light of a split in state practices.

21          THE COURT:  Did the plaintiff testify at this

22  hearing?

23          MR. CHEN:  Yes, I believe he did.

24          THE COURT:  And what did he say?

25          MR. CHEN:  I believe he attempted to -- he sought to

40

1  make the arguments that we were discussing earlier.

2         THE COURT:  What did he say?

3         MR. CHEN:  I mean, I have a transcript of the

4  proceedings before me now.

5         THE COURT:  Do I have the transcript?

6         MS. LEONE:  No, I don't believe you do.  It's

7  something we could certainly --

8         THE COURT:  Well, supply the transcript.

9         MS. LEONE:  And the third department does actually

10  go through his testimony a little bit in there.

11         THE COURT:  Provide the transcript, please, if you

12  please.

13         MR. CHEN:  But -- and I think the salient point of

14  his testimony was that he performed these synaptic therapies

15  and provided the records to the billing company.

16         THE COURT:  Did he prescribe the therapy that he

17  gave in the case that I've looked at on Exhibit 1?

18         MR. CHEN:  Right.  Well, the attached medical

19  records are the description -- are the records that he

20  provided to the billing company.

21         THE COURT:  Did he testify with respect to these

22  exhibit and say what he did?

23         MR. CHEN:  Yes.  Apparently he did.

24         THE COURT:  He did.  Okay.

25         MR. CHEN:  As he just told me, it wasn't testimony

41

1   in full about the records but it was definitely discussed

2   during the testimony and as part of the examination in cross.

3          THE COURT:  Well, they obviously didn't believe him.

4   I mean, he said he did those things and you concede he didn't

5   in what is actually described.

6          MR. CHEN:  Well, again, Your Honor, I don't want to

7   belabor the point but I think he did do what he described to

8   the medical company and what the testimony was was that the

9   medical company then translated that without input from him

10  into these various medical codes.  And that was the testimony

11  of the actual biller, this Elena Rodriguez [Ph.] --

12         THE COURT:  Okay.

13         MR. CHEN:  -- the testimony of her.

14         THE COURT:  I understand.  So in getting back to I

15  guess some of the legal matters, you know, I think it's worth

16  noting that in the asset forfeiture context there's a case

17  that Your Honor authored in 121 Nostrum [Ph.] Avenue

18  forfeiture cases, 760 F. Supp. 1015, that -- you know, where a

19  statute or an action is really punitive in nature the law

20  would be more comfortable with the scheme that placed the

21  entire burden on the Government to establish this case, that

22  forfeiture is warranted with a standard that is higher than a

23  preponderance and that such a standard may be constitutionally

24  mandated and that's basically the argument we're making here.

25  Again, dealing with what I think is both a liberty and a

42

1   property interest, not just a property interest as the state

2   has argued and I think arguably would have been the case in

3   the last forfeiture case.

4          Now, with respect to the cases cited, the State has

5   offered the Theodore Freeman and Seymour Freeman cases from

6   the Second Circuit and Eastern District from the attorney

7   reciprocal discipline context, but I think it's worth noting

8   that those were both decided before the state Supreme Court

9   decisions on a due process ground that professional discipline

10  requires a heightened standard which were cited in 2001 and

11  2000 and 1996, which I believe were before the cases cited by

12  the State.  And also roughly it's worth noting that the Second

13  Circuit case, the Thomas Freeman case, really doesn't contain

14  much substantive analysis of the proper standard to use in

15  these cases at all.

16         The State also brought up the securities fraud cases

17  but, again, under Matthews analysis I think the outcome is

18  very different.  The SEC sanctions that were at issue there I

19  believe are largely limited to the firms regulated.

20         THE COURT:  I can prevent a person from -- they can

21  prevent them from making this [unintelligible] or acting on

22  the security exchange.

23         MR. CHEN:  In --

24         THE COURT:  Which is quite serious.

25         MR. CHEN:  True, but unlike the practice of law or

43

1   medicine the financial industry has a large number of

2   lucrative business opportunities outside of the specifically

3   regulated firms, so it -- I don't think it's so much

4   foreclosing the entire profession as opposed to the regulated

5   portion of the industry, which is large but not complete.

6         And I think it's also worth noting that those that

7   practice in the financial industry -- you know, I don't mean

8   to belittle them, but they -- but compared to doctors and

9   lawyers I think they have a rela -- somewhat smaller

10  investment and time experience in working in those fields.

11  There's no required schooling and accredited schools, for

12  instance.

13        Now, with respect to the Matthews analysis obviously

14  there's the three prongs that are well known:  the liberty --

15  the strength of the interests held by individual, the risk of

16  error, and the governmental -- the Government's counterveiling

17  interest.  The main points I want to make here are with

18  respect to the liberty interests and I think that this

19  interest in professional licensure does carry a strong liberty

20  component as the various state Supreme Courts have addressed

21  the issue have found and as the Second Circuit and this RRI

22  Realty case stated as well following a Sixth Circuit decision

23  addressing the liberty interests of professional -- of

24  licensure and ability -- and the freedom to work in a

25  particular profession.

44

1              Now, the State states that it wants -- seeks to

2    distinguish these cases by saying that the liberty interest

3    is -- only attaches to the process of entering into a

4    profession rather than acting within the profession, but that

5    seems to me a rather -- not quite the distinction that's

6    important here that, you know, whether you're becoming --

7              THE COURT:  Oh, I agree with that.

8              MR. CHEN:  Entering profess -- well, and just to

9    note the Seventh Circuit case supposedly limiting focus and

10   wasn't really dealing with exit from a profession but really

11   just his entitlement to a particular job at a particular

12   university after -- as a [unintelligible] professor after his

13   contract was up.

14             Now, on the risk of error prong, you know, I think

15   the main -- one of the main points I want to make here is that

16   because we're dealing with professional licensure predicated

17   on fraud.  I think the fact that the states recognize and many

18   jurisdictions recognize that charges require a standard of

19   proof greater than a preponderance reflects at least in part

20   that these charges are more error proned and I think the --

21             THE COURT:  Well, isn't that true also of lawyers of

22   being disbarred for fraud?

23             MR. CHEN:  Yeah.  And it's true that those may

24   require -- that the logic would apply to attorney discipline

25   as well in five cases.

1          THE COURT:  Okay.  But apply the preponderance

2     standard.  What's the rules throughout the country in New York

3     and in federal court?

4          MR. CHEN:  For attorney discipline?

5          THE COURT:  Any discipline.

6          MR. CHEN:  In New York I believe it is preponderance

7     but in other jurisdictions it -- other jurisdictions do assign

8     it -- do require a clear and convincing standard for attorney

9     discipline as well.

10          THE COURT:  So, again, it's a split?

11          MR. CHEN:  Sure.  As in almost all the due process

12     cases that come across it the Supreme Court -- the U.S.

13     Supreme Court decided that, yes, there has been a split but,

14     again, working from the first -- and that split is certainly a

15     factor that can be considered.  But, again, I think the

16     primary inquiry here is under Matthews analysis what is

17     required as a standard of proof, both Matthews and also

18     looking to the allocation of risk of error there's like --

19     there are cases that address that address that as a rationale

20     for choosing a particular standard of proof.

21          THE COURT:  Well, there's a risk of error.  There's

22     also a risk for the population as a whole having fraud.

23          MR. CHEN:  Sure.  And --

24          THE COURT:  In connection with the billing and other

25     practices, particularly given a rich course of medical

46

1  facilities.

2          MR. CHEN:  Sure.  And that's certainly a factor but,

3  for example, you know, I think Judge Corson in the Seventh

4  Circuit opinion undertook this anal -- explained -- elucidated

5  this analysis that, you know, for example, a preponderance

6  standard is appropriate where, you know, if you would decide

7  incorrectly one way or the other basically interests are the

8  same.  The risk of error is borne equally.  In the criminal

9  context there's a great -- there's a much larger imbalance,

10  pretty extreme imbalance where if one -- if an innocent man is

11  wrongfully convicted, he obviously bears the loss of liberty

12  for an extended period of time and the State bears the

13  statement costs of incarcerating or incapacitating that person

14  wrongfully.  But in the other direction where an innocent man

15  goes free the State bears some loss of incapacitation and

16  deterrence but arguably relatively minor costs in that regard

17  given that one can incapacitate them in other ways.

18          THE COURT:  Well, I understand on the projections.

19  They go back to the Biblical rules and they're based strictly

20  on rules.  I mean, you could justify a policy in criminal law

21  more probable than not given the risks to he population and to

22  the defendant.  I don't -- I wouldn't support it but applying

23  a positive economic approach.

24          MR. CHEN:  Right.  Well, I offer it just as a --

25          THE COURT:  [Unintelligible] --

47

1            MR. CHEN:  -- an alternative way of thinking about

2    the problem.

3            THE COURT:  Well, I don't think it's at all helpful.

4            MR. CHEN:  All right.  Well, I'll move on, then.

5            THE COURT:  With all due respect.  I mean, it's

6    interesting, but not helpful.

7            MR. CHEN:  I'll move on, then.  But, again, with

8    respect to the fraud charges I think there is precedent for

9    the notion that they are more error prone and deserving of a

10   higher standard of proof.  They're almost always based on

11   circumstantial rather than direct evidence.  There's the case

12   People v. Ford from New York Court of Appeals explaining that

13   where there are cases that are purely circumstantial evidence

14   there's complex and problematical reasoning processes, that

15   there's a dangerous -- danger associated with circumstantial

16   evidence that a fact finder might leave logical gaps in the

17   proof offered and draw unwarranted conclusions based on

18   probabilities of low degree.  So that --

19           THE COURT:  Presumably the New York State

20   Legislature considered that balance and decided that

21   protection of the public required a preponderance.

22           MR. CHEN:  They may have considered that, but --

23           THE COURT:  Shouldn't the courts if they're

24   nonactivists generally follow the legislative policy made

25   presumably after deep thought in the opening?

1          MR. CHEN:  Well, I think it's worth noting that in

2   this case the statute is applied -- the standard of proof they

3   apply addresses position of disciplinary hearings in general.

4   There's no specific provision for fraud charges so to the

5   extent that -- so that's why I think the challenge that we're

6   bringing here is relatively narrow and actually may be a

7   circumstance that was not contemplated specifically by the

8   legislature.

9          Another point that the State brought up was that

10  these combined investigative prosecutorial and adjudicatory

11  functions which was the case in this case have been found to

12  satisfy due process.  And -- but I think that's not really

13  argument here.  It's not that those take -- that feature of

14  the proceedings itself violate the Constitution but having

15  those -- having the functions of investigation prosecution and

16  adjudication all within one body does increase the error to a

17  degree or --

18          THE COURT:  It's not constitutional.

19          MR. CHEN:  It's not constitutional standing on

20  its --

21          THE COURT:  Administrative law.  It's basic --

22          MR. CHEN:  Sure.  It's not -- even if it's not

23  unconstitutional on its own, though, that in combination with

24  the other Matthews factors, the fact that it may increase the

25  error and that there are these important individual interests

49

1   at risk would lead to the conclusion that overall -- that

2   taken the factors as a whole a higher standard of proof is

3   prescribed.

4           Now, the third prong on governmental interests and I

5   think the point we want to make here is that this -- this --

6   the notion that the efficient processing of complaints is

7   implicated by a higher standard of proof, you know, I'm not

8   sure that that's as huge a factor as the State makes it out to

9   be given that a number of states already apply a higher

10  standard of proof.  It should be clear that it's not clearly

11  still high a cost as to make it significantly difficult to

12  discipline positions where necessary and it's also unlikely

13  that the Government is bringing its cases with weaker evidence

14  than it might already be bringing based on -- only on the

15  standard of proof that they're faced with.

16          And there was a discussion earlier about the *res*

17  *judicata* effect of the Article 78 proceedings.  I do have a

18  citation from the Second Circuit, University Club v. City of

19  New York.  I believe the quote from that was that

20  constitutional challenges to legislative enactments may not be

21  raised in Article 78 proceeding to review an administrative

22  action.  And my understanding was that the -- was that the

23  facial challenge of the sort that we're bringing here was not

24  available in their 78 proceeding which is why it wasn't -- one

25  reason why it wasn't raised at least and that's a reason why

50

1  we're bringing it here.

2          The argument with the reopen procedures I think one

3  thing we wanted to clarify there is that plaintiff isn't

4  seeking a mentoring mechanism for reopening all hearings

5  whenever there's a change in the law, but rather the ability

6  to have -- for an ALJ for the plaintiff to go back to the ALJ,

7  not the director of OPMC but the ALJ that was handling the

8  original hearing or and ALJ in its place to at least consider

9  request for exculpatory evidence and to reopen the hearing and

10  decide the merits --

11          THE COURT:  Well --

12          MR. CHEN:  -- in that case.

13          THE COURT:  -- that evidence was available to him

14  and to his attorney at the time.  This is not something that

15  was hidden like a secret report.  This was generally known in

16  the field according to him and his reliance on his billing

17  enterprise.  So all of this was available and he could have

18  put this in as a defense.  Did he?

19          MR. CHEN:  This --

20          THE COURT:  There's nothing hidden.

21          MR. CHEN:  It was around.  But, again, because he

22  wasn't involved with the clinic at the time -- by the time of

23  the hearing, he didn't have access to these records and, as I

24  understand, the evidence that --

25          THE COURT:  He didn't have access to his records?

51

1          MR. CHEN:  Well, not direct access.  He wasn't

2     involved with the clinic, no.

3          THE COURT:  He could have introduced any records he

4     wanted at the administrative hearing.  You're not contending

5     otherwise, are you?

6          MR. CHEN:  No, but what was introduced at the

7     hearing was a partial set of records.

8          THE COURT:  He was represented by an attorney at a

9     hearing.  He could have put in anything he wanted including

10    other experts, including testimony of his own, which he used.

11    Did he have any other witness?

12         MR. CHEN:  Yes, he had the biller.

13         THE COURT:  He had the biller and he could have put

14    in anything he wanted.

15         MR. CHEN:  Well --

16         THE COURT:  But I just don't understand this

17    collateral -- what amounts to a collateral attack after the

18    event on the administrative hearing when all of the evidence

19    that he now proposes to put in was available to him at the

20    time of the hearing.

21         MR. CHEN:  Well, I think the specific documentary

22    evidence that he's looking for which are these bills and

23    arbitration decisions and documents he didn't know about those

24    specific documents at the time of the hearing.

25         THE COURT:  What hearing?

1          MR. CHEN:  Well, they're attached in one of the

2    exhibits that I think the State provided but there's a number

3    of peer reviews from arbitration proceedings and sample bills

4    from other providers that showed a misunderstanding.  And

5    these specific documents --

6               THE COURT:  Were they used in this proceeding?

7               MR. CHEN:  No, they weren't because he did not --

8               THE COURT:  Were they used by the board in these

9    proceed -- this proceeding?

10              MR. CHEN:  They -- no, the documents that he's

11   looking -- seeking were not used by the Court.

12              THE COURT:  So they were available to him.  I

13   don't --

14              MR. CHEN:  Right.  No, but --

15              THE COURT:  Clearly don't understand the point.

16              MR. CHEN:  No, but the point is that they -- they

17   existed but he didn't know about their existence and he didn't

18   have them available to him.

19              THE COURT:  But he was relying essentially on the

20   fact that everybody was doing this.  So this must have been

21   available to him.  This is not like <u>Brady</u> material.

22              MR. CHEN:  Well, but I think that it's somewhat akin

23   to that in that that was his argument but without -- without

24   having exculp -- such evidence directly available to him even

25   though it may have been available to the State --

53

1          THE COURT:  But there wasn't.  The --

2          MR. CHEN:  -- from their investigation --

3          THE COURT:  -- State didn't introduce it.  There's

4   no contention that the board used it.

5          MR. CHEN:  Well, the State didn't introduce it

6   because it would have gone against their case, I assume, if

7   they had.

8          THE COURT:  The State didn't use it.  There's no way

9   information that the board used it and had his attorney

10  prosecuted defense -- the defense it could -- he could have or

11  she, the defense.  It could have introduced it.

12         MR. CHEN:  But no.  I don't think that's right

13  because the doc -- he didn't -- he only learned about the

14  existence of these particular documents well after the case

15  once other providers had learned of his predicament.

16         THE COURT:  Well, I don't find that very persuasive,

17  but I understand your point.

18         MR. CHEN:  Well, I'm sorry you don't but -- and I

19  don't want to belabor the point.

20         THE COURT:  And we have most of the litigation as to

21  him.

22         MR. CHEN:  Sure.  But I think it's worth remembering

23  that the plaintiff did seek this evidence from the State

24  through a motion during the hearing --

25         THE COURT:  What motion did he make?

54

1          MR. CHEN:  He made a motion requesting that the

2    State provide -- turn over exculpatory evidence in its

3    possession and this motion was --

4          THE COURT:  Let me see the motion, please.

5          MR. CHEN:  I'm not sure if that particular motion

6    was included in the doc -- in the exhibits in this case.

7          THE COURT:  Well, let me see the motion.  Let me see

8    the motion, see what he asked for.

9          MR. CHEN:  I don't believe it's included in the

10   record that I have here, but we can submit it.

11         THE COURT:  Do you have it?  It's part of the

12   record.  Make it available.  I didn't gather from the material

13   before me that he had made a motion.

14         MR. CHEN:  I believe we signed it in the briefs but

15   if it wasn't made clear I apologize but, yes, during the

16   hearing he did make a motion to the State requesting

17   exculpatory evidence.  This motion was to deny --

18         THE COURT:  Generally or specifically with respect

19   to this evidence?

20         MR. CHEN:  I understand those --

21         THE COURT:  How [unintelligible] --

22         MR. CHEN:  I understand it's specifically to this

23   evidence, but we'll have --

24         THE COURT:  You'll have to.  We're just --

25         MR. CHEN:  We'll see.

55

1          THE COURT:  -- working without knowledge.  You'll

2     have to get it to me.

3          MR. CHEN:  Well, regardless.  He did make a motion

4     during the hearing seeking exculpatory evidence and that was

5     denied on the basis of case law that said that there was no

6     requirements to turn over exculpatory evidence.

7          Following the hearing there -- as we've discussed

8     there was a change in the governing law stating that

9     exculpatory evidence does have to be provided in these cases

10    so had that been in effect before he had made that original

11    motion obviously the grounds for that -- the denial of that

12    motion would no longer have been valid.

13         THE COURT:  Now, as I understand it he has not made

14    a motion to reopen the record now.

15         MR. CHEN:  He made a motion to the ALJ in that case

16    to seek exculpatory evidence and to reopen it if exculpatory

17    evidence was sufficient to justify it.

18         THE COURT:  No, post -- post hearing.

19         MR. CHEN:  Post judgment, yes.

20         THE COURT:  You made a motion?

21         MR. CHEN:  He -- based on the new law, yes, but the

22    ALJ denied that motion saying that there was no mechanism for

23    him, the ALJ, to reopen the hearing or to consider or to

24    gather new evidence or to order the turn over of new evidence.

25         THE COURT:  Could he have gone to the board or

56

1  somebody else?

2          MR. CHEN:  There's a provision for -- and I think

3  what the State was discussing, this proficient 23010Q which

4  permits someone to petition the director of OPMC, which is

5  different.  And the director doesn't have the power to reopen

6  a hearing but can at his discretion in consultation with

7  another attorney at the department -- in his discretion he can

8  decide whether to modify or vacate the order.

9          THE COURT:  Did he himself on the basis of --

10         THE COURT:  He can --

11         THE COURT:  -- new evidence?

12         MR. CHEN:  -- decide whether to petition the board

13  to --

14         THE COURT:  I see.  So the board --

15         MR. CHEN:  -- make it --

16         THE COURT:  -- would have to do it?

17         MR. CHEN:  Sure.  But it's within the discretion.

18         THE COURT:  Well, why hasn't he used that available

19  procedure?

20         MR. CHEN:  Because he's looking for the exculpatory

21  evidence in the first place.  He's not -- and I think to do

22  that he needs the ALJ to at least hear the motion and consider

23  the merits of that claim.

24         THE COURT:  Why hasn't he applied for the remedy

25  which is available to him?

1              MR. CHEN:  Because that doesn't provide all the

2    relief that he's seeking.

3              THE COURT:  But if he received a favorable response

4    that would put him on the road to getting the relief and

5    getting the information, would it not?

6              MR. CHEN:  It may, but it's difficult to -- it would

7    be difficult to get a favorable response without having any

8    exculpatory evidence that's in his possession in the first

9    place.

10             THE COURT:  If you have some.  You've --

11             MR. CHEN:  Well, there are samples but I believe

12   what plaintiff has asked for is additional documents --

13             THE COURT:  I understand, but you have enough to

14   show that there is an issue here, correct?

15             MR. CHEN:  Yes.

16             THE COURT:  Otherwise you wouldn't be in federal

17   court.

18             MR. CHEN:  Sure.  I think so.  And --

19             THE COURT:  Why -- I don't understand why he has --

20   why can't the federal court before exhausting his remedy in

21   state court -- in the state administrative hearing.

22             MR. CHEN:  I think he believes that there -- that

23   plaintiff believes that there is much more evidence besides

24   this that's available.

25             THE COURT:  Once he used what he had to show that

58

1    they're probably, as you put it, is more he at least has an

2    opportunity to convince the administrative powers to reopen

3    his hearing.

4              MR. CHEN:  But the 23010Q provision I don't believe

5    gives the director the power --

6              THE COURT:  May I see it, please?

7              MR. CHEN:  The statute -- yes.

8              THE COURT:  Really.

9              MR. CHEN:  Yes.  I apol -- they're over a portion

10   near the bottom.  There's no --

11             THE COURT:  Wait, wait.  Let me read it for the

12   record.  Public Health Law 230(10)(q) "At any time subsequent

13   to the final conclusion of a professional misconduct

14   proceeding against the licensee" and then there's material

15   left that clearly is not applicable.  "The licensee may file a

16   petition with the director requesting vacatur" -- v-a-c-a-t-u-

17   r -- "or modification of the determination and order.  The

18   director shall after reviewing the matter and after consulting

19   with department counsel, determine in the reasonable exercise

20   of his or her discretion whether there was new and material

21   evidence that was not previously available which had it been

22   available would have likely -- would likely have led to a

23   different result or the circumstances have occurred subsequent

24   to the original determination that warrant a reconsideration

25   of the measure of discipline.  Upon determining that such

59

1   evidence or circumstances exist the director shall have the

2   authority to join the licensee in an application to the

3   chairperson of the state board for professional medical

4   conduct to vacate or modify the determination and order as the

5   director may deem appropriate.  Upon the joint application of

6   the licensee and the director the chairperson shall have the

7   authority to grant or deny such application."

8            We've clearly come within this provision for two

9   reasons.  First, you have new evidence, correct?

10           MR. CHEN:  We have some new evidence but we think

11  there's more.

12           THE COURT:  And you have some new evidence which not

13  only is important in itself but suggests that there's more

14  evidence, correct?

15           MR. CHEN:  But there's no power that the director

16  has under this statute to provide that evidence or

17  requirements.

18           THE COURT:  And you also have a change of

19  circumstances in that the law was modified subsequent to the

20  hearing to provide that they must rely upon exculpatory

21  evidence.  Correct?

22           MR. CHEN:  Yes.

23           THE COURT:  So that PHL 230.10(q) is available.

24           MR. CHEN:  It's available and --

25           THE COURT:  I am not going to in this federal court

1  determine that a state statute of this importance is

2  unconstitutional when you have not exhausted the remedies

3  available under the statute used to deny him his license and

4  get the license back.

5          MR. CHEN:  But even -- I think it's worth

6  considering that even had my client availed himself of this

7  procedure this procedure would still have been available to

8  him and --

9          THE COURT:  Well, admit -- I just read it to you.

10  Isn't that available now?  You just conceded a few moments ago

11  that it was, I thought.

12          MR. CHEN:  It's available to him but, again, it

13  doesn't provide the relief that he requested, that he's

14  seeking in this case.

15          THE COURT:  If he uses this procedure and he's

16  successful it's possible -- I don't say it's likely, but

17  there's a good basis for saying that he will get a re-hearing

18  and that the re-hearing will be -- will result in his getting

19  his license back.

20          MR. CHEN:  Well, no, I don't believe that there's a

21  provision for re-hearing.  Am I wrong?  For a re-hearing

22  specifically.  He can -- the director can petition to vacate

23  or modify the order.

24          THE COURT:  That's right.

25          MR. CHEN:  But there's no provision for --

61

1          THE COURT:  The order would be the order finding

2   fraud and penalizing him.

3          MR. CHEN:  But that would just be the end result and

4   left to the director's sole discretion but what my client is

5   seeking --

6          THE COURT:  He has not -- you -- I'm not going to

7   say that the director wouldn't exercise his discretion

8   appropriately.

9          MR. CHEN:  Well, it's -- I think it's difficult to

10  say that this is -- this qualifies as an unexhausted remedy.

11  Again, where it's a standardless discretion and -- or to a

12  large extent standardless and --

13         THE COURT:  Well, it's not standardless because the

14  discretion has to be exercised reasonably.  I mean, it can't

15  be arbitrary.  That's clear, right?  It may be discretionary,

16  but it's not arbitrary.

17         MR. CHEN:  Of course.

18         THE COURT:  It's a very interesting case and I find

19  the arguments interesting but I don't think I'm prepared to

20  exercise any jurisdiction.

21         MR. CHEN:  Well, if it's based -- if --

22         THE COURT:  The question in my mind is whether to

23  stay the case in the federal court while you proceed with your

24  administrative remedies or to dismiss it but not on the

25  merits.  There's no statute of limitations here so he can

1  always come back.  He certainly has an Article 78 proceeding

2  if he exercised discretion arbitrarily, a new Article 78

3  proceeding.

4          Well, I think you ought to brief it.  I want the --

5  is that your position now that it should be dismissed because

6  he hasn't exhausted?

7          MS. LEONE:  Well, I think for a number of reasons

8  that all of --

9          THE COURT:  Yes or no?

10         MS. LEONE:  Yes, that's for the third claim.

11         THE COURT:  All right.  Rebrief it.  With all the

12  things we've talked about including that give considerable

13  attention to that because it seems to me decisive.

14         MR. CHEN:  Sir --

15         THE COURT:  How long do you want to rebrief it?

16         MS. LEONE:  [Inaudible]

17         THE COURT:  Two weeks.  How long do you want to

18  respond?

19         MR. CHEN:  One week.

20         THE COURT:  And then you'll submit it with a

21  proposed judgment by the state if the law supports that the

22  case is dismissed for failure to exhaust the remedy, the

23  administrative and other remedies available to the plaintiff

24  to challenge the result that he's now challenging.

25         Anything else anybody wishes to say at this point?

63

1          MR. CHEN:  At that point, it'll be in our briefs.

2          MS. LEONE:  Thank you.

3          THE COURT:  All right.  Thank you very much.  Very

4     interesting case.  I must say, I'm not unsympathetic to the

5     plaintiff.  I do believe these are serious events taking away

6     a license to practice medicine which will probably result in

7     the loss of his license to practice eventually.  Very

8     important but it's also important to protect the public and

9     the honesty of these applications for payment because the

10    amount of fraud in the medical field is enormous.  It probably

11    runs into the hundreds of billions of dollars [unintelligible]

12    care and other kinds of fraud in billing and other practices,

13    so I consider it an important and difficult case.

14          I do think the State ought to -- if there is a

15    mistake the State will have an opportunity to correct it where

16    it is provided, the procedures to do so particularly now

17    because you have a change of circumstances the law has been

18    specifically changed, right, to cover exactly what you're

19    complaining about.  Well, thank you very much for the very

20    interesting argument.  Very well written.

21          (Proceedings concluded at 11:41 a.m.)

22                      *  *  *  *  *  *

23

24

25

64

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5

6      _____

7                          Ruth Ann Hager

8  Dated:  September 15, 2010

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25